No. 45,793

KILPATRICK BROS., INC., a Corporation, and MEMPHIS MOTEL FUR-NISHINGS, INC., a Corporation, *Appellees* and *Cross-Appellants,* v. W. R. POYNTER, *Appellant,* and ROSALLEE POYNTER, His Wife, *Cross-Appellee;* ECONOMOTELS, INC., STANDARD BUILDINGS, INC., and MODERN STRUCTURES, INC. (Defendants).

(473 P. 2d 33)

Opinion filed July 17, 1970.

Arthur E. Palmer, of Goodell, Casey, Briman, Rice & Cogswell, of Topeka, argued the cause, and Ernest J. Rice of the same firm was with him on the briefs for the appellant and cross appellee.

Morris D. Hildreth, of Becker, Hildreth & Lively, of Coffeyville, argued the cause, and Harold Medill, of Independence, was with him on the brief for the appellees and cross appellants.

The opinion of the court was delivered by

HARMAN, C.: This is an action by creditors to "pierce the corporate veil" and establish personal liability of individuals for corporate debt.

Plaintiffs are two foreign corporations who furnished materials at different times to two Kansas corporations, Economotels, Inc., and Standard Buildings, Inc., the indebtedness for which was evidenced by a promissory note and in the form of open account, totaling approximately $13,000. When the indebtedness was not paid plaintiffs brought suit upon it, naming as defendants the two Kansas corporations, a successor third corporation, Modern Structures, Inc., and two individuals, W. R. Poynter and his wife, Rosalee Poynter. The amount of the indebtedness is not in dispute. Recovery was sought against the Poynters on the theory the corporations were mere shams for their individual business enterprises and the *alter ego* of each, and hence each was liable for the corporate indebtedness.

Trial to the court resulted in judgment for plaintiffs against Poynter for the amount claimed and a denial of recovery against Mrs. Poynter. Poynter has appealed from the judgment holding him liable and plaintiffs have cross-appealed from the judgment exonerating Mrs. Poynter.

The story may best be told by quoting the trial court's findings of fact and conclusions of law:

## "FINDINGS OF FACT

"The Court finds from the evidence:

"1. Prior to December, 1963, W. R. Poynter became interested in the development of mobile motels and motel operations, and from then on through 1964 and 1965 caused surveys to be made and employees of his Ford dealership, Poynter Motors, Inc., to travel and incur expenses in connection with this interest in and development of the mobile motel conception, which were later written off in the tax year of 1967 by Poynter Motors, Inc., as bad debts owed

by the parties to whom the monies were advanced; and there never was any expectation of their being repaid.

"2. Early in 1965, W. R. Poynter individually and doing business as Economotels, Inc., leased the south portion of Building No. 1415 of the Parsons Ordnance Plant for a term of five years beginning March 8, 1965, and ending March 7, 1970.

"3. On March 30, 1965, Articles of Incorporation for Economotels, Inc., were filed with the Secretary of State, State of Kansas. The affidavit of the treasurer showing $1,000.00 paid up capital was filed on April 21, 1965. W. R. Poynter was the only stockholder, and the directors were W. R. Poynter, Rosalee Poynter, and Corbin M. Shouse. The only director's meeting, other than the organization one, was held on May 6, 1966. Its minutes show that the only business conducted was the re-election of W. R. Poynter as President and Treasurer, and the election of William K. Ong as Vice-President and Secretary for the ensuing year.

"4. On May 27, 1966, Articles of Incorporation for Standard Buildings, Inc., were filed with the Secretary of State, State of Kansas, showing the execution by the incorporators on May 17, 1966. The affidavit of the treasurer, executed June 14, 1966, by W. R. Poynter and William K. Ong, was filed on June 15, 1966, in the office of the Register of Deeds, Labette County, Kansas. Rosalee Poynter was the sole stockholder. W. R. Poynter, William K. Ong, and Rosalee Poynter were elected directors; and at the first directors' meeting, W. R. Poynter was elected President. No further directors' meetings were held.

"5. On December 12, 1966, Articles of Incorporation for Modern Structures, Inc., were filed with the Secretary of State, State of Kansas, by W. R. Poynter, William K. Ong, and M. A. Cook. The affidavit of the treasurer was signed by W. R. Poynter and William K. Ong and filed with the Register of Deeds of Labette County, Kansas, on February 20, 1967. Rosalee Poynter was the sole stockholder. The first stockholder's meeting was held on February 24, 1967. W. R. Poynter acted as chairman and W. R. Poynter, Rosalee Poynter, and William K. Ong were elected directors. No further directors' meetings were held after the organizational meeting.

"6. Economotels, Inc., took over the lease and operation of W. R. Poynter in Building No. 1415 of the Parsons Ordnance Plant and manufactured portable motel units. It commenced operation in June, 1965, and continued its manufacturing process into January of 1966, when it closed down its plant, but continued to pay salaries to officers until May of 1966, when it completely ceased all operation, at which time it owed $93,726.80 to unsecured creditors.

"7. Standard Buildings, Inc., commenced operations in the middle of May, 1966, in the space occupied by Economotels, Inc., in Building No. 1415, Parsons Ordnance Plant, and in August of 1966, expanded to cover an additional portion of the building. Its primary product was mobile classrooms, and it continued its operation until February of 1967, at which time it was indebted to unsecured creditors in the sum of $66,218.38.

"8. Modern Structures commenced business in February of 1967 in the space previously occupied by Standard Buildings, Inc., in Building No. 1415, Parsons Ordnance Plant, with its principal product as mobile classrooms, which were sold direct to school districts instead of through brokers. It ceased pro-

duction in October or November of 1967, and did no business other than liquidation after December of 1967.

"9. When Standard Buildings commenced business in Building No. 1415, Parsons Ordnance Plant, it took over the equipment, fixtures, and whatever supplies were on hand previously owned by Economotels, Inc., and used them in its business. There was no written agreement between Economotels and Standard Buildings, Inc., covering this transfer, or for the use of the fixtures or building. There was no formal sale of the assets of Economotels at a fixed price to Standard Buildings, Inc., but they were used by Standard Buildings, Inc.

"10. When Modern Structures commenced business in Building No. 1415, Parsons Ordnance Plant, it took over the equipment, fixtures, and whatever supplies were on hand previously owned and used by Economotels and Standard Buildings, Inc., and used them in its operation. There was no written agreement between Standard Buildings, Inc., and Modern Structures, Inc., covering the transfer or use of equipment, fixtures, supplies on hand, or the building. There was no formal sale of the assets of either Economotels, Inc., or Standard Buildings, Inc., at a fixed price to Modern Structures, Inc., but they were used by Modern Structures, Inc.

"11. The transfer of assets from Economotels to Standard Buildings, Inc., was effected by negotiations between W. R. Poynter and William K. Ong, President and director of Economotels, Inc., and W. R. Poynter and William K. Ong, President and director of Standard Buildings, Inc., without formal Board action.

"12. The transfer of assets from Standard Buildings, Inc., to Modern Structures, Inc., was effected by negotiations between W. R. Poynter and William K. Ong, as officers of Standard Buildings, Inc., and W. R. Poynter and William K. Ong, as officers of Modern Structures, Inc., without formal Board action.

"13. When Standard Buildings, Inc., took over the plant previously operated by Economotels, Inc., no provisions or arrangements were made to insure the payment of the unsecured creditors of Economotels, Inc.

"14. When Modern Structures, Inc., took over the plant previously operated by Standard Buildings, Inc., no provisions or arrangements were made to insure the payment of unsecured creditors of Standard Buildings, Inc.

"15. In January and February of 1968, equipment, tools, and materials, most of which were used successively by the three corporations, were sold for $5,112.00, and the money was turned over to Poynter Motors, Inc., of which W. R. Poynter was president and Rosalee Poynter sole stockholder, and was used to pay loans which were personally guaranteed by W. R. Poynter and Rosalee Poynter.

"16. During all periods of their corporate existence and operation herein, W. R. Poynter was President of Economotels, Inc., Econolodge, Inc., Standard Buildings, Inc., Modern Structures, Inc., Tower Bowl, Inc., Las-Ren, Inc., and Poynter Motors, Inc., and set the policies of and made all final decisions of said corporations.

"17. At all times during their existence herein, Rosalee Poynter was the sole and only stockholder of Standard Buildings, Inc., Modern Structures, Inc., and Poynter Motors, Inc. She was a director of Economotels, Inc., Standard Build-

ings, Inc., and Modern Structures, Inc.; that all management decisions affecting the corporations were made by W. R. Poynter after consultation with his employees; that although the Defendant, Rosalee Poyuter stated that whatever her husband W. R. Poynter, Defendant, did with respect to said corporations was all right with her, and she had very limited information concerning the operation of the corporations based upon informal family conversations with her husband; that although the Defendant Rosalee Poynter executed certain documents and signed checks, the decisions as to what documents were executed was made by her husband, Defendant W. R. Poynter; that upon the instruction and direction of her husband, W. R. Poynter, Rosalee Poynter's activities were those of an automaton.

"18. On various occasions W. R. Poynter transferred funds from one corporation to the other, as money was needed by his various corporations, including Modern Structures, Inc., Economotels, Inc., Standard Buildings, Inc., Tower Bowl, Inc., and Poynter Motors, Inc., for the purpose of meeting financial emergencies.

"19. Upon the conclusion of business of Modern Structures, Inc., W. R. Poynter directed the sale and disposition of all assets without Board action, so that any cash realized from the sale of assets was applied to indebtedness for which he was personally responsible without regard to the unsecured creditors of any of said corporations.

"20. In the operation of the various corporations, W. R. Poynter permitted Mr. Ong to sign checks without authorization, knowing that they would not be honored until countersigned by himself or Mrs. Poynter.

"21. W. R. Poynter personally assumed liability for delinquent taxes to the Federal Department of Revenue for Economotels, Inc., Standard Buildings, Inc., and Modern Structures, Inc.

"22. W. R. Poynter disposed of the airplane originally purchased by Economotels, Inc., and used by Standard Buildings, Inc., and Modern Structures, Inc. The excess of the sales price over and above the mortgage was applied to indebtedness personally guaranteed by W. R. Poynter and Rosalee Poynter, thus keeping the proceeds of the sale beyond the reach of general creditors.

"23. No reports were made to the Small Business Administration of the change in use of the property from Economotels, Inc., to Standard Buildings, Inc., or of the changes in use of the property from Standard Buildings, Inc., to Modern Structures, Inc.

"24. The only annual report filed by any of the three corporations was filed by Economotels, Inc., showing the condition as of December 31, 1965, listing cash on hand of $42,604.12. This report was incorrect, as the bank statement for December 31, 1965, shows cash on deposit in the sum of $11.50.

"25. Economotels, Inc., was undercapitalized.

"26. Standard Buildings, Inc., was undercapitalized.

"27. Modern Structures, Inc., was undercapitalized.

"28. The corporations, Economotels, Inc., Standard Buildings, Inc., and Modern Structures, Inc., and Poynter Motors, Inc., were operated under the sole direction and control of W. R. Poynter, and were the 'alter ego' of W. R. Poynter, and used by him as vehicles to carry out the personal business ventures of the said W. R. Poynter. The individual Defendant, Rosalee Poynter did not treat the corporate property as her individual property.

"29. The Court finds the facts generally in favor of the Plaintiffs, Memphis Motel Furnishings, Inc., and Kilpatrick Brothers, Inc., in their respective causes of action, and against the Defendants, Economotels, Inc., Standard Buildings, Inc., Modern Structures, Inc., and W. R. Poynter.

"30. The Defendants, Economotels, Inc., Standard Buildings, Inc., Modern Structures, Inc., and W. R. Poynter, and each of them, are indebted to the Plaintiff, Memphis Motel Furnishings, Inc., in the sum of $1,848.88, plus interest at 6 per cent per annum from July 28, 1965.

"31. The Defendants, Standard Buildings, Inc., Modern Structures, Inc., W. R. Poynter, and each of them are indebted to the Plaintiff, Kilpatrick Bros., Inc., in the sum of $10,828.10, plus interest at the rate of 10 per cent per annum from August 1, 1967.

### "CONCLUSIONS OF LAW

"1. In accordance with the facts heretofore found, the plaintiff, Memphis Motel Furnishings, Inc., is entitled to receive judgment against the Defendants, Economotels, Inc., Standard Buildings, Inc., Modern Structures, Inc., and W. R. Poynter, in the sum of $1,848.88, plus interest at 6 per cent per annum from July 28, 1965.

"2. In accordance with the facts heretofore found, the Plaintiff, Kilpatrick Bros., Inc., is entitled to receive judgment against the Defendants, Standard Buildings, Inc., Modern Structures, Inc., and W. R. Poynter, in the sum of $10,828.10, plus interest at 10 per cent per annum from August 1, 1967.

"3. The legal effect of the conduct of the Defendant, W. R. Poynter, in the operation of his various corporations so that he left creditors and holders of claims no resources to which they might look for the payment of their claims is in legal effect a fraud.

"4. The Court will subject transferees to liability for satisfaction of claims against a corporation whose assets are absorbed by succeeding corporations or by individual officers thereof acting on their own behalf and for their own benefit.

"5. The manner in which the various corporations operated by the Defendant, W. R. Poynter, were controlled and acted made them mere shams for the furtherance of the purpose of the individual defendant.

"6. The corporations, Economotels, Inc., Standard Buildings, Inc., and Modern Structures, Inc., were the 'alter egos' of the Defendant, W. R. Poynter.

"7. The evidence shows that Rosalee Poynter did not exercise any control over the corporations. The actions of Plaintiffs as against the Defendant, Rosalee Poynter, are dismissed, and said Defendant is discharged with her costs.

"8. The transfers to and from, and the operation of the various corporations by the Defendant, W. R. Poynter, in net result and legal effect render such conduct so fraudulent that he is personally liable for the satisfaction of the claims against the corporations he operated."

Suit was never brought and judgment obtained against the corporations prior to the filing of the suit against the Poynters wherein they were named as co-defendants with the corporations. Appellant

Poynter first contends he has no liability for debts of those corporations by reason of K. S. A. 17-4009, which provides:

"No suit shall be brought against any director or stockholder for any debt of a corporation of which he is such director or stockholder, until judgment be obtained therefor against such corporation and execution thereon returned unsatisfied, in whole or in part."

Both the Poynters raised the issue at trial level by way of motion to dismiss. Appellant asserts the statute creates a condition precedent which must be performed, and performance so alleged in the petition, before a claim against him is good. He relies principally on our cases which hold that compliance with K. S. A. 12-105 is a condition precedent to a claim for relief against a city. K. S. A. 12-105 provides no action shall be maintained against a city on account of injury to person or property unless the person injured within three months thereafter files a written statement of the incident with the city clerk.

Appellees advance several reasons why failure to comply with 17-4009 should not bar this action. We need dwell upon only one aspect of the problem. The statute was first enacted in 1939 as a part of our general corporation code (Laws, 1939, Ch. 152, § 119). We are aware of only one case since then dealing with it. In *Blair v. Mueller*, 299 F. 2d 385, (10CA, 1962), the action was brought by creditors of a bankrupt Kansas corporation to impose personal liability upon a corporate director. The suit failed for reasons not pertinent here. However, the court did hold that the bankruptcy adjudication of the corporation relieved the creditors of the necessity of compliance with 17-4009 as a condition precedent to maintenance of the suit against the director.

The general rule on the subject is stated in 13A Fletcher, Cyclopedia Corporations, perm. ed., as follows:

"§ 6320. Judgment and execution against corporation—General rule.

"Subject to certain more or less well defined exceptions, judgment against the corporation and the return of an execution unsatisfied, are conditions precedent to enforcing the added liability of stockholders.

"If the liability is a primary one, creditors need not first exhaust their remedies against the corporation by recovering a judgment against it and issuing an execution thereon, or otherwise. Where the liability is a secondary one, the general rule is, unless otherwise provided by statute, that creditors cannot proceed against stockholders to enforce their liability until they have exhausted their legal remedy against the corporation by recovery of a judgment against it, and return of an execution wholly or partly unsatisfied, unless they show that this was impossible or would have been useless. . . .

"§ 6322.—Excuses for failure to obtain judgment or execution.

"It is generally held that the rule requiring the recovery of a judgment against the corporation and the return of an execution thereon unsatisfied before suing a stockholder does not apply when such steps are for any reason impossible, or when they would be useless, or where involving unnecessary delay and expense, as where there is only one stockholder. . . . [pp. 226-227] Nor, according to the weight of authority, does the rule apply where the corporation is otherwise shown to be insolvent, or is notoriously so. As the law does not require the doing of a useless thing, where it is shown that the corporation has no assets, creditors may proceed against the stockholders without bringing such preliminary action, even if the liability is secondary." (pp. 228-230.)

*Stocker v. Davidson*, 74 Kan. 214, 86 Pac. 136, supports the foregoing. There the trustee in bankruptcy of an insolvent corporation brought suit against certain stockholders to enforce a statutory liability which was in the nature of a contractual obligation. Among other things the defendant stockholders asserted liability could be enforced against them only after judgment and unsatisfied execution against the corporation had been obtained. In rejecting that defense this court quoted approvingly the ancient maxim that the law does not require the doing of a vain thing.

In the case at bar, prior to the time the petitions were filed, appellees were advised in writing by Mr. William K. Ong of the financial condition of Economotels and Standard Buildings. Mr. Ong, an attorney, was an officer or director and a full time employee of the two corporations. He also acted as attorney for the Poynters at trial level in this litigation. In the letter to appellees Mr. Ong reviewed the financial losses sustained by the two companies. His summation was: "This whole thing has been an unfortunate and disastrous mess." He concluded by saying, "In a nutshell, Morris, the company is defunct, and there is no hope of collecting a judgment. Several judgments have been taken and executions returned with 'no goods found' endorsement. Most companies have gone ahead this far so that they can take their tax write-off."

At trial the court judicially noticed that in the same court in four separate suits judgments had been entered against the three defendant corporations and in each of the suits executions had been issued and returned unsatisfied.

Under these circumstances, of which appellees were fully aware when they commenced these actions, preliminary suits against the

insolvent corporations would have been useless and would only have added delay and expense.

We think that in enacting 17-4009 the legislature simply had in mind codification of the common law rules previously in vogue. The reason for the proviso, wherever found, is obvious—the creditor looking to the individual stockholder or director for recovery of corporate debt must first exhaust his remedy against the corporation and against corporate assets. But when the defunct nature of the corporation is fairly established and the futility of suit is apparent, then observance of the proviso serves no purpose and the extra expense and delay incident thereto can have no justification.

We hold that compliance with 17-4009 is unnecessary where it would be useless.

Appellant challenges the sufficiency of the evidence to support the trial court's findings No. 25, 26, 27, and 28. Here the trial court found the three corporations were undercapitalized, that they were operated under appellant's sole direction and control, were used by him as vehicles to carry out his personal business ventures and were his *alter ego*. Based on these and other findings, the trial court concluded appellant's conduct in the operation of his various corporations so that creditors were left no resources was in legal effect a fraud; the court further concluded the corporations were mere shams for the furtherance of appellant's individual purposes.

Appellant recognizes the well-established rule that undercapitalization may be a factor in a determination to disregard corporate entity (see anno. 63 A. L. R. 2d 1051) but contends the evidence fails to support the trial court's findings. We cannot agree. A Parsons banker who did business with the Poynters testified on this point. He required the Poynters' personal signatures when dealing with the corporations. Although he concluded their capitalization was adequate, he prescribed a formula for determining adequacy of corporate capitalization, stating it to be between two or three times the monthly overhead expenses. Appellees produced pertinent figures on the subject, which we need not repeat. It is sufficient to say that from the beginning none of the corporations enjoyed robust financial health, and measured by the formula given, capitalization was inadequate, and the finding to that effect was amply supported in the evidence. It is apparent from the trial court's opinion that inadequate capitalization was only one circumstance given weight in the determination to disregard cor-

porate entity, and we are not called upon to decide whether it alone was sufficient to support the ultimate ruling.

Appellant also argues the evidence fails to support the *alter ego* finding of the court. First we should examine applicable law.

In 18 Am. Jur. 2d, Corporations, the following appears:

"§ 14. Disregarding corporate entity, generally.

"The doctrine that a corporation is a legal entity existing separate and apart from the persons composing it is a legal theory introduced for the purposes of convenience and to subserve the ends of justice. The concept cannot, therefore, be extended to a point beyond its reason and policy, and when invoked in support of an end subversive of this policy, will be disregarded by the courts. Thus, in an appropriate case and in furtherance of the ends of justice, a corporation and the individual or individuals owning all its stock and assets will be treated as identical.

"The principle of piercing the fiction of the corporate entity is, however, to be applied with great caution, and not precipitately. While corporate entities may be disregarded where they are made the implement for avoiding a clear legislative purpose, they will not be disregarded where those in control have deliberately adopted the corporate form in order to secure its advantages and where no violence to the legislative purpose is done by treating the corporate entity as a separate legal person. . . .

"§ 15. Particular applications of principle of disregarding corporate entity.

"Each case involving disregard of the corporate entity must rest upon its special facts. The corporate entity is generally disregarded where it is used as a cloak or cover for fraud or illegality, or to work an injustice, or where necessary to achieve equity. . . .

". . . Where the corporate fiction is merely an alter ego or business conduit of an individual, it may be disregarded in the interest of securing a just determination of an action." (pp. 559-562.)

In 1 Fletcher, Cyclopedia Corporations, perm. ed., this discussion appears:

"§ 41. Disregard of the corporate entity—In general.

"The corporation may be disregarded as a form or a 'fiction' and the ultimate party regarded in law and fact, when necessary to the justice of the case.

". . . a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.

"§ 41.1.—Alter ego

"Another rule is that, when the corporation is the mere alter ego, or business conduit of a person, it may be disregarded. The theory of alter ego has been adopted by the courts in those cases where the idea of the corporate entity has been used as a subterfuge and to observe it would work an injustice. To establish the alter ego doctrine it must be shown that the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their

own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist; and to adhere to the doctrine of corporate entity would promote injustice or protect fraud." (pp. 166-175.)

Thus we see the doctrine of *alter ego* fastens liability on the individual who uses a corporation merely as an instrumentality to conduct his own personal business, such liability arising from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation. Under it the court merely disregards corporate entity and holds the individual responsible for his acts knowingly and intentionally done in the name of the corporation (see 3 Words and Phrases, perm. ed., Alter Ego, p. 423, *et seq.*).

From the evidence we glean the following in support of the trial court's findings. The buildings in which all three corporations conducted their business was initially leased by appellant as an individual from the federal government. This lease was never transferred or changed by him throughout the corporations' tenure in the building. Corporate undercapitalization has already been mentioned. Appellant contributed what little capital there was. Apparently, as to one of the corporations, the capitalization consisted only of his promissory note. When each corporation ceased functioning, whatever assets it had on hand, including material and equipment, were transferred to the next successive corporation. All of them were engaged in building structures of the same general type. No consideration was paid for these transfers and no arrangement was made toward payment of unsecured creditors of the prior corporation. An airplane initially belonging to Economotels was thereafter used by Standard Buildings and Modern Structures and finally sold and the proceeds applied upon an S. B. A. loan which appellant had personally guaranteed. When Modern Structures ceased activities its remaining assets were sold and the proceeds turned over to Poynter Motors and used by it to pay on a bank loan personally guaranteed by appellant. He transferred funds back and forth at will between the various corporations, including Tower Bowl and Poynter Motors. This juggling of assets could scarcely have served the corporation whose funds were being diverted but would be strong indication appellant regarded all funds as his own. The rent for the building used by the three corporations was paid through Poynter Motors under some kind of vague arrangement made by him as president of Poynter Motors, Standard Buildings and Modern Structures. Appellant was an officer in all of the corporations in-

volved, set the policies and made all final decisions. He received varying amounts not in excess of $14,000 as salary each year. No board of directors' meetings of the corporations were held. Corporate reporting was largely disregarded. In his testimony, although he had difficulty in remembering which corporate office he filled in each, he stated he was the policymaking person; he described Economotels as a "vehicle" corporation.

The foregoing amply supports the challenged findings and conclusions of the trial court concerning *alter ego*. Certainly appellant conducted business with such unity of interest and ownership that the separate personalities of the corporations and of himself as an individual no longer existed. And if the acts were treated as those of the corporations alone an inequitable result would follow. Appellant himself disregarded corporate entity and we think the trial court was justified in doing the same.

We turn now to the cross-appeal. Appellees assert the trial court erred in its findings absolving Rosalee Poynter of liability. They argue the findings made, that she did not exercise any control over the corporations and her activities were those of an automaton, were not supported by substantial evidence. This is hardly the approach to be taken on appellate review. The burden of proof on this factual issue was on appellees. Here, upon evidence which was not wholly undisputed and which was subject to different interpretation, the trial court found appellees had failed to sustain that burden. There was some evidence in the record tending to support a different finding but it is not our province to weigh and redetermine the matter anew. Although Mrs. Poynter owned all the stock in the last two corporations, this fact is not of itself sufficient to treat those corporations as her *alter ego* and disregard the corporate entity (18 Am. Jur. 2d, Corporations, § 13, p. 558; 1 Fletcher, Cyclopedia Corporations, perm. ed., § 41.3, pp. 189-190).

We have discussed the extent of control and domination of the corporations by Poynter. Mrs. Poynter's role in their operation and management seems limited at most. In informal family discussions Poynter would mention business affairs in a general way and about half the time would explain to her what was happening; he would tell her what papers to sign and she signed; she had nothing to do with the active management of the business carried on by the three corporations; she worked in the bowling alley operated by Tower Bowl and drew no salary or dividends from the three

corporations; the stock was placed in her name principally to avoid probate in case of her husband's death. It appears Mrs. Poynter had very limited information on the corporate activities and participated not at all in their direction, which was under sole control of her husband. All this supports the trial court's negative finding against cross-appellants in view of which it may not be set aside.

The judgment is affirmed.

APPROVED BY THE COURT.

FONTRON, J., concurring in part and dissenting in part: I agree that the judgment of the court below should be affirmed as to the appeal, but am obliged to dissent so far as the cross-appeal is concerned. Lack of time precludes any lengthy discussion of my reasons for believing error was committed in entering judgment in favor of Mrs. Poynter.

A majority of the court appears to base its affirmance of the judgment as to Rosalee Poynter on the proposition that her ownership of the entire stock of Modern Structures, Inc., the last of the ill-fated Poynter corporations is insufficient, of itself, to impose liability.

Assuming that stock ownership, alone, is not sufficient to create liability, the record reveals far more than Mrs. Poynter's passive ownership of all the stock. She was authorized to and did countersign corporate checks by herself, signing those she wanted signed and returning others. She personally endorsed notes and signed an S. B. A. loan. And she signed the Annual Report for the year 1965—which proved to be false.

It is worthy of note that Mrs. Poynter was not only a director and the sole stockholder of Modern Structures, Inc., but of Poynter Motors, Inc., as well; that she was an officer both of Economotels, Inc. and Standard Buildings, Inc.; that she accompanied Mr. Poynter on trips, acquiesced in his decisions and was aware of the financial problems besetting the Poynter operations.

Overall, I believe the evidence clearly shows Mrs. Poynter's personal involvement in the unfortunate financial affairs of the Poynter companies and it is my feeling that she should be held equally liable with her husband. In my opinion the interests of justice would be well served in this case by piercing the corporate veil as to Mrs. Poynter as well as to her husband. (*Coal Co. v. Nicholson,* 93 Kan. 638, 653, 145 Pac. 571.)

For the reasons given I would reverse the case as to the cross-appeal.

SCHROEDER and O'CONNOR, J. J., join in the foregoing concurring and dissenting opinion.