**FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity, Plaintiff,**

v.

**Thom HUDSON; Trust LT 93–01; Kathlyn M. Hudson, Trustee for Trust LT 93–01; and M.J. Hudson, Defendants.**

Civ. A. No. 89–4185–S.

United States District Court, D. Kansas.

Feb. 27, 1991.

Lawrence D. Greenbaum, McAnany, Van Cleave & Phillips, Kansas City, Kan., for plaintiff.

John A. Reynolds, Sweet & Boyer, Salina, Kan., for defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

In this case, plaintiff Federal Deposit Insurance Corporation ("FDIC"), as receiver for the Barnard State Bank of Barnard, Kansas, seeks to recover on a $245,000 promissory note which is now in default. On August 3, 1990, this court entered a default judgment against the debtor on the note, Universal Barge & Salvage Company ("UBS"). On January 15, 1991, the FDIC's claims against the above-named defendants were tried to the court. Plaintiff seeks recovery of the principal balance and accrued interest on the promissory note from Thom Hudson under the theories of fraud and alter ego. As against defendant Trust LT–9301 ("Trust") and Kathlyn M. Hudson as trustee, the sole theory is alter ego. FDIC's fraud claim against Thom Hudson is based on FDIC's allegation that Thom Hudson obtained the loan from the Barnard State Bank based on fraudulent representations about the financial condition of UBS and about the value of the Heritage Credit stock that was pledged as collateral for the Barnard State Bank loan to UBS. At the beginning of trial, M.J. Hudson's motion for directed verdict was sustained by the court. After carefully considering the evidence adduced at trial, the court makes the following findings of fact and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

*Findings of Fact*

1. The Barnard State Bank of Barnard, Kansas made a business loan to Continental Petroleum Company ("Continental Petroleum") in the approximate principal amount of $168,000. One of the principal owners of Continental Petroleum was Donald Teeters. The Barnard State Bank loan was for operating expenses of Continental Petroleum's oil and gas drilling business and was secured by the company's oil and gas leases and equipment.

2. Trust LT 93–01 is a family investment trust for which defendant Thom Hudson was the attorney. Prior to March 1989, Continental Petroleum and the Trust, by and through Thom Hudson, had entered into a loan transaction whereby the Trust was to advance $4.8 million to Continental Petroleum in exchange for 100 percent temporary control of the company. Once the loan was repaid, the Trust would retain 50 percent control of Continental Petroleum and the principals of Continental Petroleum would retain control of the other 50

percent. Although the $4.8 million loan from the Trust was long anticipated, the money never, in fact, materialized.

3. During late 1988 and early 1989, Continental Petroleum was in default on its Barnard State Bank loan; the bank classified the loan as "nonperforming." The Barnard State Bank Board of Directors instructed Barnard State Bank President Arnold Good ("Good") to work on getting the nonperforming loans in general, and the Continental Petroleum loan in particular, removed from the "classified" list by, among other means, guarantees, collections or refinancing.

4. Good contacted Donald Teeters ("Teeters"), an owner of Continental Petroleum, in the fall of 1988 about getting the Continental Petroleum loan collected or restructured. Teeters initially assured Good that the loan from the Trust was imminent. When the Trust loan still had not arrived in early 1989, Good and Teeters decided to talk to Thom Hudson about obtaining a short-term, or "bridge," loan to Continental Petroleum to take care of the Barnard State Bank loan until the $4.8 million loan from the Trust could be made available.

5. Teeters (on behalf of Continental Petroleum), and bank president Good (on behalf of the Barnard State Bank), travelled to the Kansas City area and on March 29–30, 1989, met with Thom Hudson to discuss the possibility of a bridge loan to take care of the Barnard State Bank loan.

6. During the first meeting with Hudson on March 29, 1989, Good and Teeters asked Hudson if there was any way either he personally or the Trust could make the bridge loan. Hudson declined to do so. On March 30, 1989, however, Hudson told Teeters and Good that the bridge loan could be obtained by means of a corporation owned by a friend. After Hudson made a phone call, he presented a proposal to Good and Teeters: Univeral Barge & Salvage Company ("UBS"), a corporation without assets, could borrow the money from Barnard State Bank to pay off the Continental Petroleum loan from Barnard State Bank. In order to make UBS a financially viable borrower, Hudson would trans-

fer one million shares of stock he owned in Heritage Credit and Finance Co., Inc. ("Heritage"), a privately held Illinois corporation, to UBS. Hudson showed Good a financial statement from Heritage and a Dunn & Bradstreet report (marked as Plaintiff's Exhibits 13 and 14 at trial). After reviewing these documents, Good arrived at a value of $1.06 per share for the Heritage stock, a figure with which Hudson agreed. Based on this value of the stock, Good determined that he could fund a $245,000 loan to UBS, with 300,000 shares of the Heritage stock to be used as collateral for the loan. At the $1.06 per share value, Good believed that the UBS loan was secured and should be funded by the Barnard State Bank. In fact, the Heritage stock had no discernible market value. The loan was to be for a short period of time—for 60 days—after which the Trust was to obtain additional financing for Continental Petroleum. In consideration for the UBS note, the Barnard State Bank released Continental Petroleum from its bank debt.

7. UBS was an Illinois shell corporation created in May 1985 that had never previously done any business or owned any assets. Prior to the loan transaction underlying this lawsuit, UBS had apparently held only one shareholders and directors meeting on May 10, 1988 (the shareholders and directors consisting of Merlin W. Gunderson and Robert L. Meador) (Defendants' Exhibits 405 and 406). UBS' owner, Robert L. Meador, agreed to allow Thom Hudson and the Trust to use UBS for purposes of the proposed loan transaction. Before Good and Teeters left Kansas City on March 30, 1989, Hudson signed the promissory note as president of UBS. If Hudson was ever formally made president of UBS, that event occurred subsequent to the meeting with Good.

8. Because UBS was a shell corporation, the principal measure of the desirability and viability of the proposed loan transaction was whether the loan would be adequately secured. Specifically, the most critical factor in the bank's acceptance of the proposal (by and through Good) was

the value of the Heritage stock that Hudson had agreed to transfer to UBS and part of which was to be pledged as collateral. As stated previously, at the March 30, 1989 meeting, Hudson presented Good with a balance sheet and Dunn & Bradstreet report (Plaintiff's Exhibits 13 and 14) on Heritage which showed the company to have assets in excess of $54 million and liabilities of only $100,200. Hudson also presented Good with a stock certificate showing Hudson to be the owner of one million shares of Heritage stock. Again, based on these documents submitted by Hudson, Good and Hudson arrived at a per share value for the Heritage stock to be transferred to UBS of $1.06.

9. In arriving at this figure for the value of the proposed collateral, Good relied upon the Heritage balance sheet and financial report presented by Hudson. Defendant Thom Hudson, however, knew but did not disclose to Good that the Heritage stock had no monetary value. Hudson had acquired it six months earlier by trading stock he owned in a company called Prime Technology which also had no market value. At the time that Hudson transferred the Heritage share to UBS, "they had no market value," according to Hudson. In his deposition, portions of which were read at trial, Hudson stated, "I wouldn't have given you cash in any amount for those certificates of stock." Yet, Hudson did not advise Good that the Heritage shares—the only security for the proposed $245,000 loan—were worthless. Had Good been advised of this lack of value, he would not have agreed to Hudson's proposal, nor would the Directors of the Barnard State Bank have ratified the UBS loan transaction. Instead, based on the $1.06 per share value of the Heritage stock agreed to by Hudson, Good requested that 300,000 shares of that stock be put up as collateral on the loan to UBS.

10. Donald Teeters, who was also present at the March 30, 1989 meeting, testified that based on his review of the documents presented by Hudson and on the conversation between Good and Hudson, he concluded that the Heritage stock had sufficient value to secure the proposed loan to UBS. Thom Hudson premised the entire transaction on the Heritage stock without advising either Teeters or Good that this collateral was worthless.

11. The promissory note and security agreement signed on March 30, 1989 by "Thom Hudson, President" was a 60–day loan to UBS of $245,000 at a 13.5 percent interest rate. The only security for the loan was the 300,000 shares of Heritage stock (Plaintiff's Exhibit 7). The loan covered both Continental Petroleum's existing debt (which was discharged) and an advance of new money.

12. At bank president Good's request, Hudson provided the bank with additional documents which were enclosed with a March 31, 1989 letter to Good (Plaintiff's Exhibit 9). Those documents included a UBS financial statement prepared by Hudson, a Heritage stock certificate listing the bank as the owner of 300,000 shares, and a UBS corporate resolution authorizing UBS to borrow $245,000 from the bank and authorizing Thom Hudson to pledge 300,000 shares of Heritage stock as collateral for the bank loan (Plaintiff's Exhibits 1, 2, and 10).

13. The UBS financial statement prepared and submitted by Hudson was materially false in several respects. In the first place, it reflected assets including $1,060,000 in securities—the one million shares of Heritage stock—even though Hudson knew that the Heritage stock had no market value. The financial statement also listed assets that UBS did not in fact have (including $11,600 in cash). The UBS financial statement prepared and signed by Hudson and submitted to the Barnard State Bank also failed to disclose its principal liabilities, including two promissory notes: a $1,000,000 promissory note to Thom Hudson which Hudson had directed UBS to make "in consideration" for the transfer of the worthless Heritage stock (Plaintiff's Exhibit 5) and a $15,000 note to "Kathlyn M. Hudson, Trustee" dated March 10, 1989 (Plaintiff's Exhibit 4).

14. To obtain the $245,000 loan in the name of UBS, and to "clean up the record

of the corporate shell," Hudson prepared various corporate minute documents on March 31, 1989. (Defendants' Exhibits 401–03).

15. The Barnard State Bank Board of Directors, which included Arden Treater and Lester Myers who testified at trial, ratified the UBS loan transaction only because of Good's representation (based, in turn, on Hudson's representations), that the Heritage stock provided sufficient collateral in the event of a default on the note. Good did not have authority to make a loan without adequate collateral and he (and the Barnard State Bank) would not have made the UBS loan or released Continental Petroleum on its existing obligation had they known the pledged collateral was worthless.

16. For arranging the UBS loan transaction, Hudson was paid a $15,000 fee which came out of the loan proceeds. Hudson testified that he split this fee with R.L. Meader who had provided Hudson with the shell corporation for use in obtaining the loan. In any event, Hudson received personal financial benefit from the loan proceeds.

17. When the 60–day note came due on or about May 30, 1989, an initial interest payment of $5,527.60 was paid by the Trust but none of the principal was paid by UBS or anyone else. UBS, at Hudson's direction, gave the Trust a promissory note representing all of the interest payment made to the bank plus a 20 percent "fee." (Plaintiff's Exhibit 6). The note went into immediate default and no further payments of principal or accrued interest have been made to the present date.

18. On or about July 14, 1989, the Barnard State Bank commenced this action in the District Court of Lincoln County, Kansas, against UBS, Thom Hudson and the Trust seeking to recover on the UBS promissory note.

19. On or about August 3, 1989, the Barnard State Bank was declared insolvent by the Kansas State Bank Commissioner. The FDIC was named as bank receiver and in that capacity sold to FDIC in its corporate capacity certain assets including the UBS promissory note and 300,000 shares of pledged Heritage stock. After the FDIC was substituted as party-plaintiff on August 31, 1989, the FDIC removed the action to this court, pursuant to 12 U.S.C. § 1819 and 28 U.S.C. § 1441(b).

20. On August 4, 1990, judgment against UBS in the amount of $245,000 (the unpaid principal balance on the note) together with interest at the rate of 13.5 percent per annum, from May 31, 1989, until paid in full was entered against UBS. Plaintiff was also awarded judgment foreclosing its security interest in the 300,000 shares of Heritage stock. UBS has no assets to pay the judgment and the Heritage stock has no market value.

21. But for Thom Hudson's misrepresentations about the nature of the transaction and the security for the UBS loan, the Barnard State Bank would not have made the loan and would not have discharged the Continental Petroleum debt. The bank relied to its detriment on oral and written misrepresentations made by Hudson in his purported capacity as UBS president and attorney for the Trust. The bank, by and through its officers, directors, and employees, did not learn that the Heritage stock was worthless until after the UBS loan went into default after its due date of May 31, 1989.

22. Under the terms of the promissory note, the principal balance in the sum of $245,000 together with interest thereon from and after May 31, 1989, at the rate of 13.5 percent per annum or $90.62 per diem, is immediately due and payable to the FDIC. (Stipulations ¶ 12).

*Conclusions of Law*

1. This court has subject matter jurisdiction over the claims being asserted and personal jurisdiction over defendants. Venue is also proper in this district.

2. The FDIC (in its corporate capacity) acquired the tort and contract claims arising from the UBS loan transaction from the FDIC-receiver following the closing of the Barnard State Bank by the Kansas State Bank Commissioner on or about August 3, 1989. Although ordinarily

tort claims are not assignable to third parties, tort claims of defunct financial institutions are assignable to the FDIC-corporate upon appointment of a receiver under federal law; this court has previously determined that tort claims may be assigned to the FDIC-corporate in the context of receiverships and purchase and assumption agreements as occurred here with the Barnard State Bank. *See FDIC v. Hudson,* 643 F.Supp. 496, 498 (D.Kan.1986).

3. The tort of fraud has been generally defined as "anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust or confidence resulting in damage to another." *Goben v. Barry,* 234 Kan. 721, Syl. no. 8, 676 P.2d 90, 93 (1984).

4. Actionable fraud requires proof of an untrue statement of material fact, known to be untrue by the party making it, made with either the intent to deceive or recklessly made with disregard for its truthfulness, where another party justifiably relies upon the statement and acts to its injury. *Slaymaker v. Westgate State Bank,* 241 Kan. 525, 535, 739 P.2d 444, 450 (1987) (citations omitted). *See Hutchinson Travel Agency, Inc. v. McGregor,* 10 Kan.App.2d 461, 463–64, 701 P.2d 977, 980 (Kan.Ct.App.1985); *Scott v. Strickland,* 10 Kan.App.2d 14, 19, 691 P.2d 45, 51 (Kan.Ct.App.1984). Specifically, the elements of actionable fraud include (1) an untrue statement of fact, (2) known to be untrue by the party making it, (3) made with the intent to deceive or recklessly made with disregard for the truth, (4) where another party justifiably relies on the statement, and (5) acts to his injury and damage. *Nordstrom v. Miller,* 227 Kan. 59, Syl. 6, 605 P.2d 545, 552 (1980). Plaintiff has the burden of proving its fraud claim by a preponderance of the evidence, which should be clear and convincing. *Id.*

5. The court finds that plaintiff has proven, by clear and convincing evidence, that Hudson committed fraud against the Barnard State Bank in the UBS loan transaction. In so finding, the court finds the testimony of Arnold Good to be

credible and the testimony of Thom Hudson with regard to the UBS loan transaction to be substantially lacking in credibility. The court further finds that the material facts to which plaintiffs' witnesses, including Good, testified, were remembered distinctly, the details of the transaction were narrated exactly and in order, Good's testimony was "clear, direct and weighty," and plaintiffs' witnesses indicated no confusion as to the facts at issue. *Nordstrom,* 605 P.2d at 552 (further citations omitted).

6. Hudson's failure to advise Good or anyone else at the Barnard State Bank that the Heritage stock had no market value was a material omission, particularly since the entire loan hinged on there being sufficient collateral in the event of default. *See Citizens State Bank v. Gilmore,* 226 Kan. 662, Syl. no. 5, 603 P.2d 605, 609–12 (1979) (discussing an analogous case in which liability for misrepresentation was based upon the sellers' concealment of, or failure to disclose, the diseased state of cattle being sold and sellers knew the buyer and the financing bank were acting in reliance upon the belief that the cattle in question were healthy). Other material, false statements made by Hudson included the following: his listing of assets in the UBS financial statement that he prepared and submitted to the bank, all of which were to his knowledge at the time, and proven at trial, to be essentially non-existent; his failure to disclose on the financial statement he prepared UBS' existing liabilities, including the $1,000,000 note to himself; and his representation at the March 30, 1989 meeting with Good and Teeters (which he knew to be untrue at the time) that he was the President of UBS, by means of his signature on the note.

Hudson testified, both in his deposition and at trial, that he knew the $1.06 value assigned to the Heritage stock was untrue on March 30, 1989, but nonetheless failed to disclose this fact either to Good or to the Barnard State Bank. Hudson also knew the financial statement he submitted for UBS was untrue when he submitted it. Moreover, Good and, in turn, the Barnard

State Bank via its board of directors, justifiably relied on Hudson's representations concerning UBS' financial condition and the value of the Heritage stock to be pledged as collateral, in agreeing to loan UBS $245,000 and to discharge the Continental Petroleum debt. Hudson intended that his misrepresentations be relied upon by the bank; and he knew such reliance would follow. Finally, the bank suffered damage as a result of its reliance on Hudson's misrepresentations in that it discharged an existing debt and loaned $245,000 (plus interest) to an entity that has not and cannot repay the amount advanced. The foreclosed collateral has no market value against which the UBS debt can be set off.

■ 7. Under Kansas law, one who makes a fraudulent misrepresentation is subject to liability to the person or class of persons whom he intends or has reason to expect to act or to refrain from acting in reliance upon the misrepresentation, for pecuniary loss suffered by them through justifiable reliance in the type of transaction in which he intends, or has reason to expect, their conduct to be influenced. *Gilmore*, 603 P.2d at 606; Restatement (Second) of Torts § 531. In the present case, the class of persons whom Thom Hudson intended or had reason to expect to act in reliance upon his misrepresentation about UBS and the pledged collateral included Barnard State Bank President Good, the Barnard State Bank Board of Directors and the Barnard State Bank itself. If defendant Thom Hudson had advised the bank, by and through bank president Good, that the proposed collateral on the UBS loan transaction—the Heritage stock—was worthless (or had no market value), the bank would not have made the loan. Thus, Hudson is liable under a fraudulent misrepresentation theory for the losses suffered by the Barnard State Bank because of Hudson's misrepresentations (via Good) to the bank.

■ 8. In addition to actual fraud, which requires proof of intent to deceive, Kansas law also recognizes a cause of action for constructive fraud which consists of a breach of a legal or equitable duty which is considered fraudulent because of its tendency to deceive others or violate confidence, regardless of actual dishonesty of purpose or intent to deceive. *Andres v. Claassen*, 238 Kan. 732, Syl. no. 2, 714 P.2d 963, 970 (1986).

■ 9. Hudson's acts and omissions in connection with the UBS loan transaction also constitute constructive fraud. This court finds that Hudson acted with an intent to deceive the Barnard State Bank. Even absent such an intent, however, Hudson's oral representations and written financial statement for UBS had a tendency to deceive others, including Good, the Barnard State Bank, and Donald Teeters. Hudson's acts and omissions were undertaken without justification and for personal gain.

10. Hudson's fraud proximately caused the Barnard State Bank monetary damages because, but for that fraud, Good would not have approved and the Barnard State Bank, through its Board of Directors, would not have ratified the UBS loan transaction, which included the forgiveness of some $168,000 in debt of Continental Petroleum and the advancement to UBS of more than $75,000 in "new" loan proceeds.

■ 11. Hudson cannot avoid liability for fraud by purporting to have acted solely in his capacity as representative of UBS. In fact, Hudson may not have even had authority on March 30, 1989 to act on behalf of UBS (since his appointment as an officer postdated his meeting with Good). Furthermore, UBS had no assets and performed no business. Hudson acquired control of the shell corporation solely for the purpose of entering into the loan transaction with the bank. Even if Hudson is regarded as acting solely in his capacity as a "representative" for UBS, it is well-established that "a corporate officer or director, actively participating in the fraud practiced on behalf of a corporation, cannot escape personal liability on the ground that he was acting for the corporation or that the corporation obtained the benefit therefrom." *Lentz Plumbing Co. v. Fee*, 235 Kan. 266, 270, Syl. no. 1, 679 P.2d 736, 739 (1984); *Amoco Chemicals Corp. v. Bach*, 222 Kan.

589, Syl. nos. 6, 7, 567 P.2d 1337, 1338 (1977).

12. In the present case, it was Hudson himself and not UBS, the corporate debtor, that benefitted from the fraud. Hudson received a "fee" of $15,000 taken from the loan proceeds which he may have shared with Robert Meador. By contrast, it appears that UBS itself obtained no benefit from the loan.

13. Thom Hudson personally perpetrated a fraud on the bank, and did so for his personal benefit. Thus, Hudson is personally liable for the bank's damages flowing from that fraud.

14. The Barnard State Bank, by and through president Good and its board of directors, justifiably relied upon the representations of Thom Hudson regarding the financial condition of UBS and the value of the Heritage stock pledged as collateral in approving and ratifying the UBS loan transaction.

15. Even assuming, *arguendo*, as Hudson contends, that Good did not rely on Hudson's material misrepresentations and omissions, that lack of reliance would not be a defense to the FDIC's fraud claim against Thom Hudson. Had Good known of Hudson's misrepresentations but nonetheless approved the UBS loan, he would have been acting beyond the scope of his agency authority in making loans without adequate (or, in this case, any) collateral, according to the testimony given at trial. Good and Hudson would have both been parties to the fraud against the Barnard State Bank in failing to disclose that the UBS transaction was a sham. The Barnard State Bank's fraud cause of action is now held and asserted by the FDIC. Hudson committed fraud regardless of whether Good was an accomplice thereto. (As stated above, however, the court finds that Good was not a participant in Hudson's fraud but instead justifiably relied upon Hudson's representations concerning UBS and the Heritage stock.)

16. The statutory provisions governing the powers and functions of the FDIC "reveal a federal policy to protect" the FDIC "and the public funds which its administers against misrepresentations as to the securities or other assets in the portfolios of the banks which respondent insures or to which it makes loans." *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 457, 62 S.Ct. 676, 679, 86 L.Ed. 956 (1942). If a borrower and the failed bank "had arranged to use the note for the express purpose of deceiving" the FDIC "on insurance of the bank, or on the making of the loan," that deception cannot be the basis for an avoidance of liability when the FDIC sues the borrower on the obligation. *Id.*, at 457–59, 62 S.Ct. at 679.

17. The *D'Oench, Duhme* doctrine and its statutory counterpart, 12 U.S.C. § 1823(e), have been applied in situations where a debtor on a note or other written obligations asserts that he should not have to pay the monies owed either because he was fraudulently induced to sign the note or because of a defense such as oral accord and satisfaction. *See, e.g., FDIC v. Cover*, 714 F.Supp. 455, 457 (D.Kan.1988). Such oral side agreements or misconduct cannot be invoked by debtors to avoid their liabilities against the FDIC even if such defenses would have been viable against the original creditor-financial institution. By entering into an oral agreement which contradicts the terms of the written note subsequently acquired by the FDIC, the debtors "lend themselves to a deceptive secret agreement. Under the *D'Oench, Duhme* doctrine, then, all of the ... affirmative defenses based on that agreement are barred." *FDIC v. Vestring*, 620 F.Supp. 1271, 1273–74 (D.Kan.1985) (emphasis omitted).

18. The *D'Oench, Duhme* doctrine can be applied to this case. Hudson was a party to a deceptive scheme to obtain loan proceeds from the bank. That scheme was advanced by using a shell corporation as named debtor and by misrepresenting the value of collateral pledged for the loan. Hudson obtained the loan monies without any prospect of repayment since he knew that the corporate debtor and the collateral were, in fact, shams. The UBS financial statement, moreover, which reflected over

$1 million in assets, was part of the failed bank's records upon its closing. That this financial statement was materially false, however, was not included in any of the bank records.

Even assuming, *arguendo*, that, as Hudson contends, Good was a party to Hudson's fraud, those persons such as Hudson who do business with FDIC-insured banks are presumed to be aware of the federal rules and prohibitions which apply to the operations of those banks, including the prohibition against the placing of false statements in the records of an FDIC-insured institution. *See* 18 U.S.C. §§ 1005 and 1014. Persons such as Hudson who lend themselves to any arrangement which would tend to mislead bank examiners are estopped from raising defenses based upon that arrangement. In short, any oral side agreement or understanding that Hudson alleges that he had with Good about the value of the Heritage collateral cannot be asserted as a defense by Hudson on the fraud claim being asserted by the FDIC. *Vestring*, 620 F.Supp. at 1273–74.

19. Further, the FDIC is not required to show that the failed bank actually relied on the fraudulent UBS financial statement in order to establish its fraud claim. *See In re Smith*, 113 B.R. 297, 306 (Bankr.N.D.Tex.1990) (the FDIC, as opposed to the predecessor savings and loan institution, "need not show actual reliance" on deceptive closing statements and loan applications that were placed in the loan file contemporaneously with the making of the loan.)

20. On plaintiff's fraud claim against Thom Hudson, judgment shall be entered in the amount of $245,000 plus accrued interest (at 13.5 percent per annum from and after May 31, 1989, until paid in full, or $90.62 per diem).

21. Plaintiff also seeks judgment against Hudson and the Hudson Family Trust (LT 93–01, Kathlyn Hudson, trustee) under an alter ego theory. Under the alter ego, or "veil-piercing," theory, the "corporate entity is generally disregarded where it is used as a cloak or cover for fraud or illegality, to work an injustice, to defend crime, or to defeat an overriding public policy, or where necessary to achieve equity." 18 Am.Jur.2d *Corporations* § 50.

22. Although no one factor is determinative in the decision to impose liability under an alter ego theory, the court finds that the following factors support a finding that UBS was merely the alter ego of Hudson and the Trust: UBS did no business and owned no assets; UBS was undercapitalized and paid no dividends; corporate formalities such as annual meetings and keeping of minutes had apparently occurred only once prior to the loan transaction; Hudson himself fraudulently "capitalized" UBS by transfer of worthless stock; Hudson siphoned at least $7,500 in "corporate funds" from the loan proceeds; there was an absence of corporate records; UBS was used to promote an injustice or fraud on the Barnard State Bank; and Hudson and the Trust used the corporation as a facade to pursue their own business interests. *Sampson v. Hunt*, 233 Kan. 572, 579, 665 P.2d 743, 751 (1983); *Kirk v. H.G.P. Corp. Inc.*, 208 Kan. 777, 780, 494 P.2d 1087, 1091 (1973) (corporation found to be a tool by which the defendant conducted his own business; corporate veil pierced and judgment rendered directly against defendant).

23. The idea of the corporate entity of UBS was used here by Hudson and the Trust "as a subterfuge and to observe it would work an injustice." *Kilpatrick Bros., Inc. v. Poynter*, 205 Kan. 787, 796, 473 P.2d 33, 41 (1970) (citation omitted).

24. The UBS loan transaction served the Trust's business interest in preventing the bank from foreclosing on the oil and gas leases and equipment that were collateral on the original Continental Petroleum loan. By avoiding such foreclosure, the Trust retained the opportunity to assume 100 percent control of Continental Petroleum. The device used by the Trust to avoid this foreclosure was UBS (which assumed the Continental Petroleum debt).

25. Hudson, in his dealing with the bank, acted both in his capacity as attorney for the Trust and as "representative" of

UBS. In fact, Hudson and the Trust acted through the corporate fiction that was UBS.

26. Judgment in the amount of $245,000 plus accrued interest (at 13.5 percent per annum from and after May 31, 1989, until paid in full, or $90.62 per diem), shall also be entered against both Thom Hudson personally and the Hudson Family Trust (LT 93–01) on the theory of alter ego, as the court finds that UBS was merely the "business conduit" of Hudson and the Trust and was used by them as the artifice for obtaining the $245,000 loan from the Barnard State Bank in conjunction with their plan to obtain an interest in Continental Petroleum Company. *Kirk*, 494 P.2d at 1091.

IT IS BY THE COURT THEREFORE ORDERED that the Clerk of the Court is directed to enter judgment in favor of defendant M.J. Hudson.

IT IS FURTHER ORDERED that the Clerk of the Court is directed to enter judgment in the amount of $245,000 plus accrued interest from May 31, 1989, to the date of payment at 13.5 percent, or $90.62 per diem, in favor of plaintiff against defendants Thom Hudson and Trust LT 93–01, and against Kathlyn M. Hudson in her capacity as Trustee for Trust LT 93–01.