(855 P.2d 968)

No. 66,199 [1]

ROBERT K. GROVE and BONNIE K. GROVE, *Appellees/Cross-Appellants,* v. ORKIN EXTERMINATING COMPANY, INC., *Appellant/Cross-Appellee.*

Opinion filed January 24, 1992.

*Thomas D. Kitch* and *Alan R. Welch,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, for the appellant.

*Robert T. Cornwell,* of Law Offices of Robert T. Cornwell, of Wichita, for the appellees.

Before LEWIS, P.J., BRAZIL, J., and JOHN M. JAWORSKY, District Judge, assigned.

JAWORSKY, J.: This is an action for fraud in which Orkin Exterminating Company, Inc., (Orkin) appeals from a $250,000 punitive damage award. K.S.A. 1990 Supp. 60-3701. Robert K. and Bonnie K. Grove cross-appeal.

Four issues are presented: (1) Is the punitive damage award supported by clear and convincing evidence? (2) Did the trial court err in excluding evidence? (3) Did the trial court err in refusing to award court costs? and (4) Did the administrative judge err in failing to recuse Judge Buchanan?

In 1972, Orkin treated the house located at 11710 East Clark Street in Wichita for termites and issued then-current owners Mr. and Mrs. Ralph Miles a Lifetime Termite Repair Guarantee. The guarantee provided that Orkin would repair any damage caused by subterranean termites after the initial treatment if Orkin discovered a live infestation, and Orkin agreed to provide subsequent annual inspections and any necessary re-treatment in exchange for a yearly fee. Both the Miles and their successors in interest, Dennis and Donna Ward, made the annual payments required to keep the contract in force.

The Wards refinanced the property in March 1987 by obtaining an FHA loan and, as a requirement of that loan, obtained a VA clearance letter certifying the house was free of termites. On March 21, 1987, Orkin issued a clearance letter certifying that, after careful visual inspection, "[n]o visible evidence of infestation from wood destroying insects was observed." Later that same year, in July 1987, the Wards sold the property to the Groves for $54,900. Just prior to the closing of the Wards-Groves sale, the Wards discovered some possible termite damage on the side of a drawer in a built-in set of drawers located in a hallway of the house, and called Orkin regarding the damage. Orkin inspector Brent Lochridge inspected the property on July 8, 1987. Lochridge concluded the damage on the drawer was from a prior

infestation and informed the Wards there were no existing termites in the area. After inspecting the entire house, Lochridge issued another VA clearance letter on July 9, 1987, certifying there was no visible evidence of termite infestation.

The Groves began remodeling the house the day after closing, on July 10, 1987. During the remodeling, the Groves discovered that the house had a severe termite infestation, and they subsequently incurred expenses totaling $50,138.55 to remedy the problem and repair the extensive damage. The Groves then sued Orkin for the amount stated above and requested punitive damages. Orkin admitted liability under its guarantee up to the value of the residence, but denied that it had engaged in any conduct warranting imposition of punitive damages. In this posture, the case went to a jury trial on the issue of punitive damages.

After a six-day trial and during jury deliberations, the presiding juror sent the court a written question asking whether the amount of $50,138.55 was all that could be awarded on the Groves' claim for damages. The trial judge, Paul Buchanan, informed him it was. Thereafter, the jury returned a verdict finding the Groves' damages were $50,138.55. The jury also issued special verdicts, finding Orkin's action in issuing the VA clearance letter was willful, wanton, fraudulent, malicious, and a deceptive act, and that Orkin had ratified the acts of its agent, Brent Lochridge. In accordance with the jury verdict, the trial judge awarded the Groves actual damages of $50,138.55 and later awarded punitive damages in the amount of $250,000. Orkin filed motions for judgment notwithstanding the verdict or a new trial, but the court denied both motions.

Orkin timely appealed. The Groves timely cross-appealed.

Orkin contends the evidence at trial which showed that Orkin inspector Lochridge violated several internal company policies is insufficient, by itself, to support the punitive damage award. Orkin does not, however, challenge the amount of the punitive damage award. It merely argues that violation of company policies, in the absence of any other evidence showing willful or wanton conduct, fraud, or malice, is a patently insufficient basis to impose punitive damages. The Groves contend that Orkin's abstract legal principle is incorrect and, in any event, under the

proper standard of review, the record clearly contains sufficient evidence to support the award.

The Groves' theory of liability at trial was that Lochridge negligently inspected the premises on July 8, 1987, and committed fraud by issuing a patently false certification letter on July 9, 1987. The Groves discovered their injury on July 10, 1987. Thus, their cause of action accrued after July 1, 1987, and before July 1, 1988. Pursuant to K.S.A. 1990 Supp. 60-3701(i), the punitive damage award is governed by the provisions of K.S.A. 1990 Supp. 60-3701. Subsection (c) of that statute establishes the plaintiff's burden of proof to recover punitive damages and also establishes this court's standard of review. Subsection (c) states: "In any civil action where claims for exemplary or punitive damages are included, the plaintiff shall have the burden of proving, *by clear and convincing evidence* . . . that the defendant acted toward the plaintiff with willful conduct, wanton conduct, fraud or malice." (Emphasis added.)

Thus, the question this court must answer is whether the Groves proved, by clear and convincing evidence, that Orkin acted towards them with willful or wanton conduct, fraud, or malice. In reviewing the evidence on this issue, this court is required to view the evidence in the light most favorable to the plaintiffs. *Folks v. Kansas Power & Light Co.,* 243 Kan. 57, 73, 755 P.2d 1319 (1988); *Wooderson v. Ortho Pharmaceutical Corp.,* 235 Kan. 387, 416, 681 P.2d 1038, *cert. denied* 469 U.S. 965 (1984).

Clear and convincing evidence means:

"[T]he witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue. [Citations omitted.]" *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 78, 596 P.2d 816 (1979).

See *Nordstrom v. Miller,* 227 Kan. 59, 65, 605 P.2d 545 (1980).

The record indicates an abundance of clear and convincing evidence supports the award, even if the evidence showing that Lochridge violated company policy is disregarded. As noted above, the Groves' predecessors in interest discovered what they

believed to be termite damage on the side of one of the drawers just prior to the date of closing and immediately called Orkin for an inspection. When Lochridge and two trainees inspected the property, Lochridge inspected the one drawer the Wards had pointed out and concluded the damage resulted from a prior infestation. None of those present during the inspection who testified at trial could remember if Lochridge removed the remaining three drawers to inspect for further damage.

However, after the Groves purchased the house and discovered termite damage, they had the house inspected by Jim Foster, an inspector for the Kansas State Board of Agriculture, Pesticide Enforcement Section. Foster inspected the house on four different occasions during various stages of remodeling. On his first visit, approximately two weeks after Lochridge certified the house was free of termites, Foster examined sheetrock that had been removed from one of the bedroom walls. He stated the side of the sheetrock exposed to the living area contained visible evidence of termite damage, some of which had been repaired and some of which had not. He also examined the hallway drawers on this visit and, after removing the drawers from their framework, discovered a mud tunnel which started at the floor and extended approximately five feet up the wall. Foster explained that termites build mud tunnels to maintain a high-humidity environment in which to move around. Discovery of an active mud tunnel such as this would ordinarily cause an inspector to suspect damage from termites. Foster believed this particular mud tunnel was "active" based on its appearance and, based on the size of the tunnel, he believed it had been present for some time.

Foster testified that, based on the visible evidence available as of the date of Lochridge's inspection, a qualified and properly trained termite inspector who had done a thorough inspection would have discovered the termite infestation and damage.

Furthermore, Foster determined that the main entrance for the termites was the bath-trap area where the bathtub plumbing went through the concrete slab underneath the house. At trial, there was a factual dispute about whether the trap was accessible, but the reinspection tickets Orkin produced during discovery indicated the bath-trap area was checked each year on annual inspection and that no termites were found. Although Lochridge

could not specifically recall checking the bath-trap area, the clearance letter he issued on July 9, 1987, indicated there were no inaccessible areas of the house. Foster testified there would have been termites in the bath-trap area on the date of Lochridge's inspection. Based on this evidence, the jury was justified in believing that Lochridge either did not check the bath-trap area or was grossly negligent in doing so.

Factually, this case is remarkably similar to the situation present in *Ettus v. Orkin Exterminating Co.*, 233 Kan. 555, 665 P.2d 730 (1983), in which the court upheld a punitive damage award, stating, "It would serve no useful purpose to detail at length the voluminous evidence in this case upon which the jury may have found Orkin committed fraud." 233 Kan. at 571.

K.S.A. 1990. Supp. 60-3401(b) defines "fraud" as "an intentional misrepresentation, deceit or concealment of material fact known to the defendant to . . . cause injury." Subsection (f) of the statute defines "wanton conduct" as "an act performed with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequences of the act."

As noted above, the jury found Lochridge's actions in this case were willful, wanton, fraudulent, malicious, and deceptive and that Orkin ratified his acts. Even without considering the extensive testimony that Lochridge failed to follow several Orkin policies, ample evidence exists for the jury to conclude Lochridge's negligence in performing the inspection was wanton, and his act of issuing the clearance letter constituted fraud. Orkin's contentions are without merit.

The first issue the Groves raise in their cross-appeal is whether the court erred in excluding evidence that Orkin failed to properly treat the house involved in this case as well as several other houses. When Orkin attempted to introduce such evidence through Foster's testimony, the court ruled it was inadmissible because the Groves could no longer sue on the original treatment.

While the Groves were not allowed to introduce such testimony before the jury, the evidence was presented to the court by a proffer during Foster's testimony. Foster stated that Orkin had completely failed to treat the ground underneath the concrete slab on the east end of the house and had only partially treated the slab underneath the north wall of the house. Foster stated

the treatment was wholly inadequate, comparing it to building a four-sided corral with only three sides, making it impossible to contain anything or keep anything out. He also stated that his office had received several similar complaints regarding Orkin's Wichita branch.

This evidence certainly was relevant to show that Orkin's Wichita branch continually engaged in wanton conduct as a general business practice and, if the evidence is believed, would have bolstered the Groves' claim that Orkin knew the house was infested. From this evidence, the jury could conclude Orkin performed acts "with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequences of the act." K.S.A. 1990 Supp. 60-3401(f). Similar evidence was relied upon in *Ettus* to support a punitive damage award. 233 Kan. at 559. See also *U.S.D. No. 490 v. Celotex Corp.*, 6 Kan. App. 2d 346, 359, 629 P.2d 196, *rev. denied* 230 Kan. 819 (1981) ("In actions involving fraud, evidence of the same or similar fraudulent misrepresentations made to other than the party is competent and relevant for the purposes of establishing the elements of knowledge, motive and intent to defraud."). The fact that the Groves could not sue based on the original treatment should not have resulted in the exclusion of the improper treatment evidence.

However, while it may have been error to exclude such evidence, the Groves have not shown how that error prejudiced them in any way. Although the jury did not hear about improper treatments, it awarded the Groves all the damages they prayed for. Furthermore, the trial judge did hear the evidence, and it was the court rather than the jury which set the amount of the punitive damage award. It must be presumed that the trial court considered such evidence in awarding punitive damages because the court failed to specifically indicate that it did not consider such evidence. No reversible error is shown.

The Groves' second issue in their cross-appeal concerns the trial court's failure to award them court costs of $4,804.86. At a hearing on a motion to settle the journal entry after the hearing on the punitive damages claim, the Groves orally requested the trial court to assess costs against Orkin. The court denied this request and ruled each party would be responsible for its own

costs, but did not explain its reasoning. Thereafter, the Groves filed a motion for reconsideration of this ruling, but the court denied the motion, stating "claim for costs must be made at time judgment is entered."

K.S.A. 60-2002(a) provides: "Unless otherwise provided by statute, or by order of the judge, the costs shall be allowed to the party in whose favor judgment is rendered."

A trial court's assessment of costs under this statute is discretionary, and this court cannot reverse that determination on appeal absent an abuse of discretion. *Dollison v. Osborne County,* 241 Kan. 374, 386, 737 P.2d 43 (1987); *Negley v. Massey Ferguson, Inc.,* 229 Kan. 465, 472-73, 625 P.2d 472 (1981).

The pleadings filed in this case indicate the court abused its discretion in denying the Groves' request for costs. The original petition filed on September 20, 1988, specifically prayed for the plaintiffs' costs in the action, and each amended petition also prayed for costs. The plaintiffs' oral motion for costs at the hearing on the motion to settle the journal entry thus merely renewed their request for costs. The court's ruling that the Groves did not request assessment of costs prior to the entry of judgment is not supported by the record; the court's ruling on this issue is reversed, and the case is remanded for reconsideration of this issue. On remand, a hearing must be held to determine the appropriate amount to be assessed as costs.

The Groves' final contention focuses on alleged misconduct by defense counsel. According to the parties, Judge Buchanan was originally assigned this case by the presiding civil judge for the Sedgwick County District Court, Ron Rogg. The trial was scheduled to begin on December 5, 1989, but was postponed due to the illness of counsel for the Groves. Buchanan was transferred to the Sedgwick County District Court's Domestic Department on January 1, 1990.

The Groves' attorney alleges that Orkin's counsel thereafter engaged in ex parte discussions with Presiding Civil Judge Rogg and Administrative Judge Michael Corrigan in an attempt to keep Judge Buchanan assigned to the case. Although the record is not clear as to when the final trial assignment was made, the administrative judge assigned the case to Judge Buchanan because he had ruled on matters of "substance or importance" on motions

in limine. A transcript of the motion in limine hearing appears in the record, and the transcript shows that Judge Buchanan made preliminary rulings on no less than seven evidentiary issues. It should be pointed out that this was not a simple case; the pretrial conference order identified 20 factual issues and 14 legal issues to be decided at trial.

When the Groves' attorney told Mr. Grove that Judge Buchanan would be assigned to hear the case, Grove was concerned that the defendant's counsel seemed anxious to have Judge Buchanan hear the case and requested that his own attorney take measures to have the case assigned to any other judge in the civil department.

On January 31, 1990, some six days before trial was scheduled to begin, the Groves filed a motion pursuant to K.S.A. 20-311d requesting a change of judge. Judge Buchanan heard and denied the motion on February 2, 1990. On the same day, the defendant's attorney filed his own affidavit attesting to the facts stated above. The Groves filed an affidavit stating, "Based upon the conduct of Thomas D. Kitch as reflected in the Affidavit of Robert T. Cornwell, some sort of personal bias, prejudice or interest exists which will prevent your Affiant and his wife from receiving a fair and impartial trial." Also on February 2, 1990, Administrative Judge Corrigan reviewed the affidavits pursuant to K.S.A. 20-311d(b), but denied the Groves' motion.

The Groves state in their brief that they suspect the defendant's counsel "selected" Judge Buchanan because punitive damages were involved, and they point out that Judge Buchanan only awarded punitives of less than one-tenth of one percent of Orkin's 1986 gross income when the total allowable amount under K.S.A. 1990 Supp. 60-3701(e)(2) would have been less than two percent of Orkin's 1986 gross income. The defendant's attorney alleges that he contacted Judge Rogg after plaintiffs' counsel informed him that Judge Rogg wanted to schedule the trial date in January 1990 to advise Judge Rogg that he (the defendant's attorney) would not be available until February 6, 1990. The defendant's attorney alleges that he merely asked Judge Rogg if Judge Buchanan would still hear the case since he heard the parties' motions in limine. Judge Rogg suggested that the defendant's attorney contact Judge Corrigan and discuss the matter with him, and the

defendant's attorney did so. The defendant's counsel claims no evidence shows that the Groves did not receive a fair trial, and he asks for costs and attorney fees "for having to respond to this frivolous aspect of the Groves' cross-appeal."

The Groves essentially contend that the defendant's attorney's alleged desire for Judge Buchanan to hear this case somehow demonstrates the judge was not impartial. The standard to be applied in cases charging a lack of impartiality by the trial judge is

"whether the charge of lack of impartiality is grounded on facts that would create reasonable doubt concerning the judge's impartiality, *not* in the mind of the judge himself, or even, necessarily, in the mind of the litigant filing the motion, but rather in the mind of a reasonable person with knowledge of all the circumstances. [Citations omitted.]" *State v. Logan,* 236 Kan. 79, 86, 689 P.2d 778 (1984).

See *State v. Griffen,* 241 Kan. 68, 72, 734 P.2d 1089 (1987).

This is not a case where there are numerous and erroneous adverse rulings of a trial judge. In *Sheldon v. Board of Education,* 134 Kan. 135, 4 P.2d 430 (1931), the court stated that numerous and erroneous adverse rulings which are subject to review, by themselves, would not ordinarily be sufficient to show bias or prejudice sufficient to disqualify a judge. 134 Kan. at 140. Against this backdrop, it would be difficult to conclude that Judge Buchanan was biased to the point that he should have been disqualified merely because defense counsel expressed a desire for Judge Buchanan to hear the case. As noted above, the motion in limine hearing resulted in several evidentiary rulings which shaped the course of the trial. The request for a change of judge did not come until six days before the trial was to begin. A reasonable person with knowledge of all the circumstances would not conclude that Judge Buchanan lacked impartiality.

While the Groves' contention that Judge Buchanan was not impartial does not appear to have merit, it does not appear the issue is frivolous or raised for purposes of harassment or delay. Accordingly, defense counsel's request for costs and attorney fees is denied. See Supreme Court Rule 7.07(c) (1991 Kan. Ct. R. Annot. 37).

The punitive damages award is supported by clear and convincing evidence and is affirmed. On the cross-appeal, the trial

judge's exclusion of improper treatment evidence resulted in no reversible error and is affirmed. The trial judge's refusal to award costs was erroneous and is reversed, and the case is remanded for reconsideration of this issue. The Groves' claim that Judge Buchanan was not impartial is not supported by the record, and the trial court's finding on this issue is affirmed. Defense counsel's motion for costs and attorney fees is denied.

Affirmed in part, reversed in part, and remanded with directions.