CITIZENS STATE BANK, Plaintiff,

v.

SHEARSON LEHMAN BROTHERS, INC., Defendant.

Civ. A. No. 93–2351–JWL.

United States District Court, D. Kansas.

Dec. 30, 1994.

Matthew D. Keenan, Paul W. Rebein, Shook, Hardy & Bacon, Overland Park, KS, for plaintiff.

J. Randall Coffey, Blackwell, Sanders, Matheny, Weary & Lombardi, John W. Shaw, Nicholas L. DiVita, Matthew V. Bartle, Lisa J. Henoch, Bryan Cave, Kansas City, MO, for defendant.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

#### I. Introduction

On October 20, 1994, a jury returned its verdict in this fraud case finding the defendant, Shearson Lehman Brothers, Inc. ("Shearson"), liable to the plaintiff, Citizens State Bank ("CSB"), for $236,000.00 in actual damages. It also found that the plaintiff was entitled to an award of punitive damages. Because the court had held under advisement that portion of defendant's motion for judgment as a matter of law (Doc. # 150) pursuant to Fed.R.Civ.P. 50(a) which focused on the subject of whether or not prejudgment interest was due to the plaintiff,[1] the court directed the clerk to enter a minute order reserving entry of judgment pending the determination of that issue. On December 19, 1994, following the receipt of written submissions, the court conducted a separate proceeding regarding the punitive damage issue as provided for in K.S.A. 60–3702.[2] At the hearing, the parties introduced several exhibits pertinent to the proper amount of punitive damages to be awarded and counsel for both sides presented oral argument.

Having considered all of the evidence in the case, the papers filed by the parties and counsel's arguments, the court is now prepared to issue its ruling on the interest issue raised in the Rule 50 motion and concerning the amount to be awarded as punitive damages in the case.[3] For the reasons set forth below, the court finds that the plaintiff is not entitled to prejudgment interest and the court directs the clerk to enter judgment for the plaintiff against the defendant for actual damages in the amount of $236,000.00 and for punitive damages in the amount of $500,-000.00.

#### II. Discussion

##### A. Prejudgment Interest

■ The plaintiff contends that it is entitled to prejudgment interest against the defendant computed at the contract rate for the

---

1. At trial the parties stipulated that there were no facts in dispute as to this issue and that it presented a pure question of law for the court to determine after the jury returned its verdict.

2. The parties agree that Kansas law is applicable to this diversity of citizenship action.

3. Today the court received a letter from one of defendant's attorneys reminding the court of the issue concerning a credit to defendant for the settlement proceeds received by plaintiff from Bertram Gold. The court will not address that issue here but will entertain a motion to alter or amend the judgment which raises that issue so that both parties may fully brief it.

loan which it was induced to enter into with TransAmerica Equities, Inc., ("TEI") by the false representations of the defendant's former employee, Ephraim Yurowitz. The defendant contends that Kansas law does not authorize an award of prejudgment interest, either at the contract rate or the statutory rate, in a case such as this one. The court agrees with the defendant.

■ The court's analysis starts with *Scholz Homes, Inc. v. Wallace*, 590 F.2d 860 (10th Cir.1979), cited by the defendant. There, in rejecting a "benefit of the bargain" damage approach analogous to what the plaintiff seeks here, the court stated, "[W]e find no Kansas authority allowing such recovery against a defendant who fraudulently induces the plaintiff to contract with a third party." *Id.* at 864. This court has not been shown by the plaintiff, nor has it been able to find on its own, any Kansas authority that permits such a recovery, either. As *Scholz Homes* holds, recovery under these circumstances is limited to recouping "out of pocket loss" because the remedial goal is to place the injured party in the position it would have occupied had it not been defrauded. *Id.* Allowing plaintiff a judgment against this defendant for the interest which TEI obligated itself to pay would give plaintiff the benefit of its bargain with TEI and not merely restore it to the status quo ante.

■ The plaintiff cites *Sanders v. Park Towne, Ltd.*, 2 Kan.App.2d 313, 578 P.2d 1131 (1978), in support of its position. In *Sanders*, the Kansas Court of Appeals upheld the trial court's allowance of prejudgment interest on the unpaid balance of certain promissory notes as "part of the actual loss". *Id.* at 320, 578 P.2d 1131. Although arguably at odds, this court believes that the two cases are, in fact, consistent. In *Sanders*, the fraud affected the priority of a mortgage lien, which deprived the plaintiff of the ability to collect not only the principal but also the interest which it was due. Put another way, had the fraud not occurred the plaintiff would have recovered the entire unpaid balances of the promissory notes, including the interest. The plaintiff was "out of pocket" the interest which was secured by the lien. By contrast, in *Scholz Homes*, a

promoter induced the Wallaces to enter into a contract to build a residence with an insolvent builder, who defaulted on the obligation, and then sought to recover from the perpetrator of the fraud the difference between the contract price and the actual cost of construction. As the court explained, had the Wallaces not been defrauded they would have contracted with a builder who was reputable and solvent, but not necessarily one which would have agreed to that contract price, and the measure of damages, therefore, was the difference between the price a reputable and solvent builder would have charged and what the Wallaces actually paid for the residence. *Scholz Homes* at 864.

This case is not like *Sanders* in that the fraud did not *prevent* the plaintiff from *collecting* the loan from TEI. The fraud induced the *making* of it to begin with. In that sense it is much more like *Scholz Homes*. Absent the fraud, CSB would not have loaned the money at all. It did not actually advance sums over and above the principal. Although failing to collect interest at some rate deprives CSB of the use value of the money advanced, since there was no evidence offered to show what use it would have made of the money has it not made the TEI loan. It would be purely speculative to assume that it would or could have made another loan, or invested the money otherwise, had CSB not loaned the money to TEI. Thus, its out of pocket loss is limited to the unpaid principal balance, which is what the jury awarded as actual damages.

This case is also unlike *Federal Deposit Insurance Corp. v. Hudson*, 758 F.Supp. 663 (D.Kan.1991). In *Hudson*, Judge Saffels found the individual defendant who had induced the loan to his insolvent corporation liable for the unpaid interest as well as the principal balance. His decision, however, seems to have been influenced by the inequity of the alternative result, which would have allowed the individual at fault the free use of the money, as well as by certain alter ego considerations which are not applicable to this case. At least as to the fairness prong, *Hudson* is consistent with Kansas cases such as *Lightcap v. Mobil Oil Corp.*, 221 Kan. 448, 562 P.2d 1 (1977), in which prejudgment in-

terest was allowed because the defendants "made active use of plaintiffs' money, and plaintiffs were deprived of that use." *Id.* at 469, 562 P.2d 1. In this case, the *defendant* did not make use of the plaintiff's money and neither equitable principles nor Kansas law in general would seem to allow for the recovery of interest at the contract rate here.

■ There has also been some question raised concerning whether the Kansas prejudgment interest statute (K.S.A. 16–201) might provide an alternative basis for the plaintiff to recover for its loss of the use of the funds that were advanced to TEI. However, that statute, and the cases decided under it, make it clear that it is not applicable absent the violation of duties which arise under a contract, either express or implied. The Kansas Supreme Court has recently restated that point in *Kilner v. State Farm Mut. Auto Ins. Co.*, 252 Kan. 675, 847 P.2d 1292 (1993). There, in considering whether or not prejudgment interest should be awarded under the statute, the court held, "Where an amount is due *upon contract,* either express or implied, and there is no uncertainty as to the amount which is due or the date on which it becomes due, the creditor is entitled to recover interest from the due date." *Id.* at 687, 847 P.2d 1292 (emphasis added). Here, where the defendant's then employee induced the plaintiff to enter into a contract with a third party based upon a false credit reference, with only indirect benefit to the defendant (derived from the value to it of having the guilty employee in its employ), there was neither an express contract or any basis in the law to imply one. This is a straight tort case and K.S.A. 16–201 simply does not apply.

### B. Punitive Damages

■ The court has carefully considered the seven factors listed in K.S.A. 60–3702(b) and discusses them below. However, it does bear noting that the statutory language which sets out those factors is precatory and not mandatory in nature. The Kansas Legislature has suggested that certain criteria be reviewed by indicating that the court at the punitive damage proceeding "may" consider those enumerated factors. This court and others have determined that these considerations are not exclusive. See *e.g. Patton v. TIC United Corp.*, 859 F.Supp. 509 (D.Kan. 1994); *Fenstermacher v. Telelect,* 1992 W.L. 100312 (D.Kan. April 22, 1992) (O'Connor, J.). Moreover, the determination of an amount of punitive damages should not be a purely mechanistic application of these factors. The judge before whom the case was tried, who has been exposed to the evidence and can evaluate for him or herself the nature of the conduct which gave rise to punitive damage liability, should exercise considerable discretion in fixing the proper amount to be awarded in order to accomplish the purposes for which punitive damages are authorized by statute. Here, the court has taken into consideration all of the evidence presented during the trial of this matter as well as the evidence and arguments presented in the punitive damages proceeding in arriving at its decision.

It also merits mention that this case is somewhat atypical of punitive damage cases. For example, the defendant was found vicariously liable for misconduct which was only indirectly of consequence to the defendant itself. Unlike cases such as *Patton* or *Fenstermacher,* where liability was based on corporate decisions to forego safety measures, here it is linked to conduct by an employee, who is no longer with the company, who, although having acted within the course and scope of his employment and having been facilitated in carrying out the wrongful act by his position with the defendant, appears to have been primarily involved in an escapade of his own. The real culpability of the defendant Shearson is one step removed from the actionable misconduct itself. Motivated by greed, in an attempt to retain certain customers of the firm while Andy Yurowitz (the employee's father) was suspended, the defendant rehired and loosely supervised an employee, Ephraim Yurowitz, whose prior misconduct in providing false financial information to benefit his brother in law, and in attempting to bribe the defendant's own internal investigator, was so outrageous that the most reasonable conclusion which the employee could have drawn was that he was authorized to continue to engage in such conduct as long as he did not get caught.

Shearson appears to have made a business decision that it was worth the risk to tolerate Ephraim Yurowitz in an attempt to save the revenues from his father's accounts and in doing so, the jury and this court concluded, an unmistakable signal was given to Ephraim Yurowitz that he was free to ignore the defendant's own rules and policies as long as commissions continued to be generated and his supervisor, Paul Tuchman, continued to profit thereby.

As a result of this factual setting, it is sometimes difficult to distinguish between what the statute refers to as the "questioned conduct" or "misconduct", which gave rise to the liability for punitive damages (Ephraim Yurowitz's fraudulent credit reference), and the conduct which caused Shearson to be liable for it (authorizing or ratifying Ephraim Yurowitz's misconduct by sending him the signal). Although the employee committed an intentional tort, for which the defendant was held liable, the conduct of Shearson which seems deserving of punishment was more reckless than intentional. That is, there is no indication that Shearson sent the signals to Ephraim Yurowitz with the intention of harming CSB or anyone else, for that matter. In fact, there is no reason to doubt that Shearson would have preferred that Ephraim Yurowitz devote his full attention to servicing Andy Yurowitz's customers. The authorization or ratification was, as contemplated by the statute, implied, rather than express. In any event, Shearson is liable, it does deserve to be punished and the court has attempted to keep its focus on the misconduct that brought this case to such a conclusion.

1. *Likelihood at the time of misconduct that serious harm would arise from the defendant's misconduct*

This factor includes several components. Applying them illustrates the difficulty of separating out the "misconduct" of Ephraim Yurowitz and the liability-producing authorization or ratification conduct of Shearson. For example, when one focuses on Ephraim Yurowitz's misconduct, the "likelihood" that serious harm would arise might be tied to the likelihood that a small town bank in western

Kansas would rely on a brief telephone conversation to make a large, unsecured loan to an out of territory borrower. However, Ephraim Yurowitz, and Shearson, certainly should have known that if there was reliance on his false statement, harm was likely to flow from it. While there is some room with regard to this factor to argue that CSB was, at the least, imprudent in relying so heavily on this reference, the fact remains that Shearson's then employee intended CSB to rely on information which he knew to be false.

A second component is the question of "serious harm". Without minimizing the financial loss that was incurred, there was no risk of personal injury or death arising from the misconduct. That sets this case apart from cases such as *Patton* and *Fenstermacher*.

A third component is the "arise from" prong of this factor. In other words, to what extent did the misconduct cause the loss. Shearson argues that CSB should not be permitted to take the position that it looked directly to the securities which Ephraim Yurowitz falsely represented were in TEI's account because those securities could have been liquidated absent them being pledged by TEI (which it expressly refused to do). The court looks at causation differently, however. Although there were many reasons why CSB may have been inclined to make this loan, the "Shearson" reference put the deal over the top. Ephraim Yurowitz portrayed TEI as a financially stable operation with the prospects of easily repaying the loan in question, even absent the phantom securities. Thus the misconduct did cause the loan to be made and Shearson's having enabled Ephraim Yurowitz to give TEI the imprimatur of Shearson's enviable reputation certainly facilitated the loss which CSB experienced.

2. *Degree of the defendant's awareness of that likelihood*

Analysis of this factor goes hand-in-hand with analysis of the first factor. Ephraim Yurowitz was, or certainly should have been, well aware that if CSB relied it could suffer financial harm. Shearson, in its turn, should certainly have been aware that by authoriz-

ing or ratifying that conduct, harm was likely to arise.

### 3. Profitability of the defendant's misconduct

This factor is particularly difficult to analyze under the facts of this case. The "misconduct" was not at all profitable to the defendant. However, the conduct in which Shearson engaged which constitutes implied authorization or ratification was profitable to the extent of commissions from those of Andy Yurowitz's customers who would have otherwise left Shearson. That prospect was at least sufficient to induce Shearson to give Ephraim Yurowitz the unwarranted second chance.

### 4. Duration of the misconduct and any concealment of it

The duration of the "misconduct" was very brief and there is no indication that the defendant concealed it once it was brought to Shearson's attention. However, the authorizing or ratifying conduct which gave rise to Shearson's liability, the signals which were sent to Ephraim Yurowitz by rehiring and loosely overseeing him, lasted over several years. Moreover, there was some concealment related to the false U–4 and U–5 forms filed by Shearson.

### 5. Attitude and conduct of the defendant upon discovery of the misconduct

Ephraim Yurowitz was terminated on the heels of the defendant's having had this incident brought to its attention. Paul Tuchman, the former branch manager responsible for much of the conduct which forms the evidentiary basis for the conclusion that Shearson impliedly authorized or ratified the false reference, was removed from his position as branch manager. However, it is clear to the court from having seen the videotaped depositions of Paul Tuchman and his former superior, Steven Fields, that they, and Shearson, were generally unchastened by this entire affair. The court took away the impression that Mr. Tuchman's principal reaction was impatience with having to put up with the process and that, essentially, he was only sorry that Ephraim Yurowitz had been

so stupid as to allow himself to get caught. Mr. Tuchman, who is no longer employed by defendant, showed no indication that he regretted his part in this matter otherwise. That lingering attitude undercuts the notion that his demotion signalled acceptance of responsibility by Shearson or that Shearson impressed on Mr. Tuchman just how inexcusable his conduct had been. Moreover, Mr. Fields demonstrated an aloof detachment from any responsibility on Shearson's part which, while possibly part of a comprehensive trial strategy of denial which simply did not sell to the jury, was not indicative of any commitment to ensuring that such an event might not occur again in the future. Mr. Fields seemed to epitomize the defendant's posture that a calculated business decision had simply gone wrong, the loose cannon went off and it was time to engage in damage control.

### 6. Financial condition of the defendant

Shearson is hugely profitable and could afford to pay the maximum award authorized by law.

### 7. The total deterrent effect of other damages and punishment imposed upon defendant as a result of the misconduct

The only damages or punishment incurred by defendant to date are the compensatory damages awarded by the jury to plaintiff.

### 8. Summary

In returning the verdict it did, the jury determined that the plaintiff had proven, by clear and convincing evidence, that Ephraim Yurowitz, while acting within the course and scope of his duties with defendant, was guilty of fraud and that defendant authorized or ratified that conduct. The court believes that this finding is amply supported by the evidence and agrees with the jury's imposition of liability for punitive damages on defendant for the fraud of Ephraim Yurowitz.

In arriving at an amount of punitive damages sufficient to punish the defendant for its conduct and to deter it and others from similar conduct in the future, the court has

considered the factors enumerated in K.S.A. 60–3702 as discussed above. It has also considered the substantial litigation costs the plaintiff incurred in prosecuting this action.[4] The court believes that the sum of $500,000.00 is a sufficient award to accomplish these ends. It is more than twice the actual damage award and makes the plaintiff whole for its litigation expenses. While the number may not seem high as a proportion of Shearson's net worth or gross revenues, it is not an inconsequential sum and places a significant price tag on the conduct which Shearson engaged in here.

*III. Conclusion*

It is, therefore, by the court ordered that defendant's motion for judgment as a matter of law on the subject of prejudgment interest (Doc. # 150) is granted. It is further ordered that the clerk of the court is directed to enter judgment in favor of plaintiff in the amount of $236,000.00 in actual damages and $500,000.00 in punitive damages.

**IT IS SO ORDERED.**

---

4. Exhibit R to plaintiff's memorandum regarding punitive damages (Doc. # 168), which was not rebutted by the defendant in any way, indicates total attorney fees of $336,923.75, expenses incurred by counsel of $41,108.85, expenses incurred directly by the plaintiff of $50,886.26 and trial expenses of $12,253.61. The total is $442,272.47.