**Maria F. RAMIREZ, Plaintiff,**

v.

**IBP, INC., Defendant.**

**No. 94–4101–SAC.**

United States District Court,
D. Kansas.

Dec. 11, 1996.

---

David W. Hauber, Boddington & Brown, Chtd., Kansas City, KS, David O. Alegria, McCullough, Wareheim & LaBunker, P.A., Topeka, KS, for Maria F. Ramirez.

Jack L. Whitacre, Spencer, Fane, Britt & Browne, Kansas City, MO, Brian F. Stayton, Blackwell, Sanders, Matheny, Weary & Lombardi, Overland Park, KS, J. Nick Badgerow, Kelly W. Milligan, Spencer, Fane, Britt & Browne, Overland Park, KS, for IBP, Inc.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This retaliatory discharge case comes before the court to determine an appropriate award for punitive damages.

## I. BACKGROUND

After a three-day trial, the court submitted this case to the jury. On April 5, 1996, the jury deliberated for several hours before returning a verdict for the plaintiff. The jury awarded the plaintiff $53,648 in lost wages and/or benefits and $28,477 in compensatory damages. In addition, the jury found that IBP had acted in a willful, wanton or malicious manner in terminating the plaintiff in retaliation.

After giving the parties sufficient time to negotiate a possible settlement, to conduct limited discovery and to submit briefs, the court conducted a punitive damages evidentiary hearing on September 23 and 24, 1996, pursuant to K.S.A. 60–3702. At the hearing, counsel presented opening statements, elicited the testimony of several witnesses and presented documentary evidence, all of which were presented as pertinent in determining a proper award of punitive damages. The parties submitted their proposed findings of fact and conclusions of law on October 25, 1996. The court heard the parties closing arguments on November 12, 1996.

Having considered all of the evidence in the case, the briefs and papers filed by the parties and counsels' arguments, the court is ready to issue its order on the appropriate amount of punitive damages to be awarded. At the hearing, the court reserved several evidentiary objections which will be impliedly or expressly decided by this order.[1]

## II. GENERAL PUNITIVE DAMAGES LAW

By Kansas statute, if the jury allows punitive damages, the court must conduct a sepa-

---

1. The plaintiff attached to her trial brief and introduced at the punitive damages hearing seventeen deposition and trial excerpts to which the defendant objected pursuant to Rule 32 of the Federal Rules of Civil Procedure. The court reserved its ruling and permitted the defendant to file counter-designations. All of the depositions and the trial testimony occurred in other retaliatory discharge cases or similar litigation against IBP. For the most part, the excerpted testimony concerns such general topics as the supervisors' attitudes toward injured employees and the supervisors' treatment of such employees. The plaintiff does not cite the testimony as direct evidence of the circumstances surrounding her discharge. Though the defendant had and exercised its right to examine the different witnesses on the relevant topics, the defendant now objects to the court receiving the same in this punitive damages hearing. Though it would have been most reasonable had the defendant withheld its objection to the form of the testimony, IBP insists on making it and for some unexplained reason believes that the plaintiff should be put to the time and expense of subpoenaing the witnesses and the court should be required to

hear the live testimony of these witnesses. The court hopes that IBP has some reason for its objection other than being contentious. If not, this would reflect poorly on the defendant's judgment.

Besides Rule 32(a), "depositions may also be independently admissible under the Federal Rules of Evidence." *Angelo v. Armstrong World Industries, Inc.,* 11 F.3d 957, 963 (10th Cir.1993). Looking to rules 804(b)(1) and 801(d)(2)(D), the court sustains the defendant's objection to the plaintiff's attachments one, two, three, seven, eight, and eleven. The court overrules all of the defendant's objections to the other attachments. The court admits the defendant's counter-designations which correspond to the plaintiff's admitted attachments.

As for the deposition of Sylvia Lira, the court will consider her testimony only to the extent that it is some evidence of IBP's supervisors' continuing general practices and attitudes towards injured employees. The court considers this evidence attenuated not only by the passage of time but also by the fact that it relates to a different plant.

rate proceeding "to determine the amount of such damages to be awarded." K.S.A. 60–3702(a).[2] During the proceeding, the court is to consider matters relevant to the following seven factors:

> (1) The likelihood at the time of the alleged misconduct that serious harm would arise from the defendant's misconduct;
>
> (2) the degree of the defendant's awareness of that likelihood;
>
> (3) the profitability of the defendant's misconduct;
>
> (4) the duration of the misconduct and any intentional concealment of it;
>
> (5) the attitude and conduct of the defendant upon discovery of the misconduct;
>
> (6) the financial condition of the defendant; and
>
> (7) the total deterrent effect of other damages and punishment imposed upon the defendant as a result of the misconduct, including, but not limited to, compensatory, exemplary and punitive damage awards to persons in situations similar to those of the claimant and the severity of the criminal penalties to which the defendant has been or may be subjected.

K.S.A. 60–3702(b). "At the conclusion of the proceeding, the court shall determine the amount of exemplary or punitive damages to be awarded and shall enter judgment for that amount." K.S.A. 60–3702(b).

■ The jury phase of this trial, like in most others, did not include evidence and arguments uniquely relevant to several of the punitive damage factors. The plaintiff Ramirez did introduce evidence concerning the intentional and willful nature of the defendant IBP's actions, and this evidence also is relevant to five of the punitive damage factors. The court shall consider such evidence to have been admitted also for this subsequent proceeding. *Cf. Citizens State Bank v. Shearson Lehman Bros., Inc.,* 874 F.Supp. 307, 310 (D.Kan.1994).

■ "Punitive damages are imposed by way of punishing a party for malicious or vindictive acts or for a willful and wanton invasion of another party's rights, the purpose being to restrain him and to deter others from the commission of like wrongs." *Henderson v. Hassur,* 225 Kan. 678, 694, 594 P.2d 650 (1979) (citation omitted). Before K.S.A. 60–3702 was enacted, the Kansas Supreme Court had identified the following factors as relevant in assessing punitive damages: "the nature, extent and enormity of the wrong," the defendant's intent, "all circumstances attending the transaction," the size of the actual damages award, the "defendant's financial condition and the probable litigation expenses." *Id.* The factors listed in K.S.A. 60–3702 are not the exclusive considerations in assessing punitive damages. *Citizens State Bank v. Shearson Lehman Bros.,* 874 F.Supp. 307, 310 (D.Kan.1994). Finally, an award of punitive damages is more than an mechanistic application of the factors. Having tried the case, the court should evaluate all relevant evidence and, in the exercise of reasonable discretion, arrive at a punitive damage award which furthers the purposes of restraint and deterrence. *Id.*

## III. ANALYSIS OF FACTORS

The court instructed the jury that punitive damages would not be allowed unless it found the defendant to have acted *willfully,* that is, "performed with a designed purpose or intent on the part of a person to do wrong or to cause an injury to another," or *wantonly,* that is, "performed with a reckless disregard or complete indifference to the probable consequences of the act," and/or *maliciously,* that is, "performed with an intent to do the harmful act without a reasonable justification or excuse." The jury was not asked to specify whether the defendant acted willfully, wantonly, or maliciously. At the very least, the court must assume the jury found that the defendant acted wantonly in discharging the plaintiff.

---

**2.** At K.S.A. 60–3702(c), the jury's determination of liability for punitive damages is referred to as "the **initial phase** of the **trial.**" (emphasis added). By inference, the Kansas Legislature viewed the court proceeding to determine the amount of punitive damages as a subsequent phase of the trial.

1. *Likelihood of serious harm arising from conduct*

 This factor under the punitive damages analysis is more concerned with the likelihood of "serious harm" than with the defendant's knowledge of the harm. To make this evaluation, one must understand the plaintiff's personal, physical, and financial situation at the time of the retaliatory discharge. This factor also assesses the causal connection between the defendant's conduct and the harm to the plaintiff.

The plaintiff, Maria Ramirez ("Ramirez"), worked for IBP, Inc. ("IBP") from November 5, 1990, until her termination on June 12, 1992. At trial, Ramirez testified that she was twenty-five years old, married and a mother of two children, ages six and three. Though born in Texas, Ramirez resided in Mexico for most of her life. In October of 1990, she moved to Emporia, Kansas. While she seems capable of communicating simple messages in English, her ability to converse about more involved matters appears somewhat limited.

Since her discharge, Ramirez has supplemented her husband's salary by selling cassettes of Mexican music and Avon products. Ramirez testified that she has not been successful in locating other full-time work. While she was working at IBP, her husband also had a part-time job at IBP. Her husband was attending college and working towards a masters degree. At some point, either shortly before or after the discharge, her husband started working full time.

The loss of employment is no doubt a serious one. *Peabody Galion v. Dollar,* 666 F.2d 1309, 1318–19 (10th Cir.1981). The emotional and financial harm from termination is exacerbated when the worker is physically injured, for the chances of finding other employment are decreased not only by the firing but by the injury. The plaintiff's expert, Williams Albott, a licensed psychologist, testified that losing a job can be "one of the most stressful events that adults can go through." (Vol. II Jury Trial Tr. p. 401). Albott testified that Ramirez's discharge

from IBP triggered a "psychological downward spiral" in Ramirez causing "depression" and "hypochondriacal expression of depression." *Id.* The record substantiates that the discharge placed a serious emotional strain[3] on her family and most likely caused some financial problems as well. The plaintiff's opportunities for replacing the family's lost income do not appear many or varied because of her limited language skills.

The jury obviously did not believe that the plaintiff would have had a career at IBP. Still, the jury believed that the plaintiff's harm was more serious than a short-term economic loss. The court finds there was a strong likelihood that the plaintiff would sustain a serious harm from her retaliatory discharge.

The jury found that the defendant discharged the plaintiff because she exercised a right under the workers' compensation act, because she might file a claim for workers' compensation benefits, or because she incurred one or more absences which the defendant knew or had reason to know were due to work-related injuries for which she might file a workers' compensation claim. The court finds ample evidence demonstrating the causal connection between the harm discussed above and the act of discharging her. Though the jury was not required to specify the unlawful motive or motives on which the defendant acted, all three motives are unlawful under Kansas law.

*Degree of the Defendant's awareness of likelihood of harm*

This factor focuses on whether the defendant should have known the serious harm that would result from the retaliatory discharge. The analysis here goes hand-in-hand with the first factor. *Citizens State Bank,* 874 F.Supp. at 311. The plaintiff argues the serious harm here is self-evident to the defendant. " 'It takes little foresight to acknowledge that a person whose employment is terminated is going to suffer mental anguish, embarrassment and even humilia-

---

**3.** It is important to note that the jury found that plaintiff had suffered humiliation, embarrassment and emotional distress from her retaliatory discharge. The jury awarded her compensatory damages in the amount of $28,477.00.

tion.' " *Canady v. J.B. Hunt Transport, Inc.*, 970 F.2d 710, 715 (10th Cir.1992) (quoting *Williams v. ABS Enterprises, Inc.*, 734 P.2d 854 (Okla.App.1987)). The court agrees with the plaintiff that it should have been no surprise to IBP that discharging an injured employee who speaks little English would cause significant emotional and financial harm.

*Profitability of the Defendant's Misconduct*

■■■ In one respect, this factor focuses on the savings to the defendant in firing the plaintiff as opposed to retaining her and dealing with her injuries and insurance claims. The analysis, however, does not end there. The term, "profit," as used in K.S.A. 60–3702, has a "broader meaning" than just the "gain over expenditure." *Gillespie v. Seymour,* 255 Kan. 774, 784, 877 P.2d 409 (1994). The evaluation of profit is not limited to the particular transaction or incident on which the suit was brought. Rather, it "involves looking at the defendant's profit from the course of conduct giving rise to the plaintiff's injuries." *Gillespie v. Seymour,* 255 Kan. at 784, 877 P.2d 409.

IBP benefitted indirectly from the discharge. *See Oliphant v. Perkins Restaurants Operating Co.,* 885 F.Supp. 1486, 1490 (D.Kan.1995). At the time of Ramirez's discharge, IBP had in place an incentive system in which supervisors received bonuses for keeping the workers' compensation costs in their plants below established levels. Supervisors in the processing plant understood their goal was to keep workers' compensation costs at $250 per employee. Supervisors kept goal books that monitored the injured employees on such things as performance, workers' compensation costs, and leave time. In discussing injured employees, supervisors often referred to them disdainfully, and others even called them "cripples." Suffice it to say, IBP had in place an incentive system that lowered workers' compensation costs while at the same time contributing to an aggressive, if not retaliatory, attitude in some supervisors towards injured employees. The record does not furnish any reliable basis for calculating the amount of profit attributable to these supervisors adopting

discriminatory or retaliatory attitudes. Still, the court does not believe that IBP can reasonably disclaim that it profited from the incentive system and the instances of pretextual discharges of injured employees.

*Duration of the Misconduct and Intentional Concealment*

In *Grove v. Orkin Exterminating Co.,* 18 Kan.App.2d 369, 374–75, 855 P.2d 968 (1992), the Kansas Court of Appeals said that evidence the defendant had improperly treated other houses, besides the plaintiff's house, "was relevant to show that Orkin's Wichita branch continually engaged in wanton conduct as a general business practice." At least for the duration of the bonus incentive program, and maybe longer, the defendant has had knowledge that certain supervisors may have been retaliating against injured employees. One can reasonably infer from the record that IBP may have tolerated retaliation against injured employees for some period of time. Even so, the court does not find any persuasive evidence of IBP of openly encouraging or condoning such retaliatory activities.

*Defendant's Attitude and Conduct upon Discovery of Misconduct*

■■■ The rationale behind this factor "is that a contrite defendant who promptly takes steps to remedy a problem that contributed to a plaintiff's injury should not be punished as severely as a defendant who maintains business as usual after the incident giving rise to the claim for punitive damages." *Smith v. Printup,* 254 Kan. 315, 352, 866 P.2d 985 (1993). Consequently, evidence of remedial conduct is relevant only if it evidences a contrite defendant taking steps to remedy a situation. There is no evidence that the defendant has taken remedial measures for this reason. IBP has yet to adopt any formal policy or rule for the work place that expressly prohibits retaliation or harassment of injured employees. The attitude of the defendant's different managers who have appeared in connection with this case is not what this court considers to be contrite.

On the other hand, since the plaintiff's discharge, the defendant has eliminated the

bonus incentive program and set up a procedure by which all terminations of injured employees are reviewed by its human relations and legal departments. Arguably, these measures are some effort at addressing the pretextual discharge of injured employees. Whether these measures will effectively deter retaliation is an open question, but they do appear to have stemmed the tide of retaliation suits against IBP.

### Financial Condition of the Defendant

The court here considers what award would likely deter the defendant from engaging in the similar conduct based on its financial condition. IBP is a very large corporation. Its highest annual sales over the last five years was $12,700,000,000 in 1995. In the last eight or nine years, IBP's book value has increased from $458,000,000 to well over $1,000,000,000. According to David Stallings, the plaintiff's accounting expert, the actual value of IBP is well over $2,000,000,000. To impose a punitive damages award in relation to IBP's total wealth would mean a sizeable award. Punitive damage awards that do not correlate to the defendant's financial condition may still have a deterrent effect.

### Deterrent Effect of Other Damages

█ Within this category, the courts have factored in the defense litigation costs as having a deterrent effect. *See Ruiz v. Quiktrip Corp.,* 826 F.Supp. 1284, 1286 (D.Kan. 1993); *Ensminger v. Terminix Intern. Co.,* No. 92–1402–KMH, 1995 WL 912746 (D.Kan. Aug. 25, 1995). Such costs are a deterrent in that they reduce a defendant's profit in the same way as administrative penalties, fines or civil damage awards. The defendant has incurred slightly over $60,000 in litigation costs here.

The defendant appears particularly sensitive of its workers' compensation costs, including the litigation expenses associated with it. Considering IBP's large labor force and the sizeable annual turnover of it, IBP is highly motivated to have an image that does not promote employee litigation. The record shows there to have been a number of law-

suits filed against IBP arising out of events occurring in 1991 and 1992. Most of these suits were resolved in IBP's favor prior to the verdict in the instant case.

Since the mere filing of lawsuits caused the defendant to address the issue of retaliatory discharges against injured employees, the court has every reason to believe that this jury verdict itself will have a significant impact on IBP's policies for dealing with injured employees. A two-to-one ratio of punitive damages to actual damages communicates to the defendant that the court considers this case and the issues in it to be serious matters and that the court expects the defendant to take measures to restrain from such retaliation. In addition, the award warns the defendant that if it fails to take responsible and prompt measures then it can expect that subsequent courts may well look to fashioning a punitive damages award in relation to IBP's financial wealth. This award also serves as a deterrent when considered in the context of the litigation exposure that IBP faces from its large labor force.[4] The court believes a punitive damages award in the amount of $175,000 is sufficient to deter the defendant and other employers. In this court's judgment, this case simply is not one in which the employer's attention or attitude would only be affected by punitive damages in relation to the employer's wealth.

IT IS THEREFORE ORDERED that the plaintiff is awarded punitive damages in the amount of $175,000. The court directs the clerk of the court to enter judgment in the favor of the plaintiff in the amount of $82,125.00 in actual damages and $175,000 in punitive damages;

IT IS FURTHER ORDERED that the plaintiff's response to the defendant's motion for new trial shall be filed no later than twenty days following the clerk's entry of judgment.

---

4. The court believes IBP is extremely motivated to create a situation in which injured employees who have been terminated will be treated fairly

and will not have reason to feel that they have cause to file a lawsuit and possibly recover in excess of a quarter of a million dollars.