Guillermo SANJUAN, Plaintiff,

v.

IBP, INC., Defendant.

No. 94–1541–DES.

United States District Court,
D. Kansas.

Dec. 17, 1999.

David O. Alegria, McCullough, Wareheim & LaBunker P.A., Topeka, KS, for Guillermo Sanjuan, plaintiff.

Jack Focht, Boyd A. Byers, Foulston & Siefkin L.L.P., Wichita, KS, Kenneth G. Gale, Adams & Jones, Chartered, Wichita, KS, for IBP Inc., defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on a punitive damage award proceeding. Both parties filed briefs as to the proper amount of punitive damages. A hearing was held in which both parties presented evidence. After hearing oral arguments, the court is ready to rule.

## I. BACKGROUND

Plaintiff brought a retaliatory discharge action against his employer, IBP, Inc ("IBP"). Plaintiff claimed that IBP discharged him in retaliation for exercising his rights under the Workers Compensation Act. IBP argued that the plaintiff was discharged due to poor work performance. The jury found that the plaintiff could have returned to his job and that IBP discharged the plaintiff in retaliation for exercising his rights under the Workers Compensation Act. The total jury award was $99,532.00. The jury awarded $97,032.00 for past wages and $2,500.00 for embarrassment, humiliation and emotional distress. The jury also found that IBP acted in a willful, wanton or malicious manner in terminating the plaintiff and plaintiff was entitled to punitive damages.

## II. DISCUSSION

The court instructed the jury that punitive damages would not be allowed unless the jury found the defendant acted willfully, "with a designed purpose or intent on the part of a person to do wrong or to cause an injury to another," or wantonly, "with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequences of the act," or maliciously, with "intent to do a harmful act without a reasonable justification or excuse." Because the jury was not asked to specify which category, the court must assume the jury found at the very least the defendant acted wantonly.

. While the jury determines whether to award punitive damages, it is the responsibility of the trial court to determine the appropriate amount of the punitive damages in a separate proceeding. Kan.Stat. Ann. 60–3702(a). "Punitive damages are imposed by way of punishing a party for

malicious or vindictive acts or for a willful and wanton invasion of another party's rights, the purpose being to restrain him and to deter others from the commission of like wrongs." *Ramirez v. IBP, Inc.,* 950 F.Supp. 1074, 1077 (D.Kan.1996) (citing *Henderson v. Hassur,* 225 Kan. 678, 594 P.2d 650 (1979)).

The Kansas statute lists seven factors the court may consider in determining the amount of punitive damages:

(1) The likelihood at the time of the alleged misconduct that serious harm would arise from the defendant's misconduct;

(2) the degree of the defendant's awareness of that likelihood;

(3) the profitability of the defendant's misconduct;

(4) the duration of the misconduct and any intentional concealment of it;

(5) the attitude and conduct of the defendant upon discovery of the misconduct;

(6) the financial condition of the defendant; and

(7) the total deterrent effect of other damages and punishment imposed upon the defendant as a result of the misconduct, including, but not limited to, compensatory, exemplary and punitive damage awards to persons in situations similar to those of the claimant and the severity of the criminal penalties to which the defendant has been or may be subjected.

Kan.Stat.Ann. § 60–3702(b). This list is not exclusive. *Scheufler v. General Host Corp.,* 915 F.Supp. 236, 241 (D.Kan.1995). "Having tried the case, the court should evaluate all relevant evidence and, in the exercise of reasonable discretion, arrive at a punitive damage award which furthers the purposes of restraint and deterrence." *Ramirez,* 950 F.Supp. at 1077 (citing *Citizens State Bank v. Shearson Lehman Bros.,* 874 F.Supp. 307, 310 (D.Kan.1994)). The court evaluates each factor below.

**A. Likelihood of Serious Harm Arising from Defendant's Conduct and Degree of Defendant's Awareness of Such Harm.**

The misconduct at issue in this case is IBP's discharge of plaintiff in retaliation for exercising his rights under the Worker's Compensation Act. There was substantial evidence presented at trial that IBP retaliated against Sanjuan. This case does not involve the serious harm of death or personal injury. However, this case does involve the serious financial and emotional harm that loss of employment causes.

The plaintiff immigrated from Mexico when he was sixteen with a twelfth grade education. Before he began working at IBP, plaintiff worked in agricultural fields, picking fruit and vegetables. When he was twenty, plaintiff got a job at IBP in processing. Plaintiff worked at IBP from 1988 until he was fired on December 23, 1992. At the time he was fired, plaintiff was married and had three children to support. Although Sanjuan speaks conversational English, he needs an interpreter for more complex issues. There was evidence presented at trial that Sanjuan used an interpreter to communicate with management at IBP on several occasions. With plaintiff's work history and limited ability to speak English, there is no doubt that plaintiff would have difficulty finding new employment opportunities.

The harm caused by loss of employment is increased when an employee is physically injured. "The emotional and financial harm from termination is exacerbated when the worker is physically injured, for the chances of finding other employment are decreased not only by the firing but by the injury." *Ramirez,* 950 F.Supp. at 1078. The plaintiff indeed had difficulty finding another job. Sanjuan was unable to find steady work for three years. He eventually found a job in construction, which he currently holds today. IBP argues that Sanjuan could easily have found work at other meat processing plants lo-

cated in the Finney County area. Sanjuan was allegedly fired for poor work performance. It is not likely that an employer would hire a person who was fired from a similar job for poor work performance.

There was also a serious risk that plaintiff would suffer emotional harm due to the loss of his job and his lack of employment prospects. There was evidence presented at trial that the plaintiff suffered from emotional distress. Sanjuan's marriage and family also suffered. The jury awarded $2,500.00 to plaintiff for embarrassment, humiliation, and emotional distress. There was a strong likelihood that Sanjuan would sustain serious harm when IBP fired him in retaliation for exercising his rights under the Workers Compensation Act.

IBP should not be surprised that firing a person with plaintiff's injury, work history, and limited ability to speak English would result in serious harm. IBP argues that there was no threat of serious harm because Sanjuan represented that he was totally disabled. This argument is without merit. Sanjuan worked every day until he was fired. His application for benefits was not filed until February 3, 1993, several months after he was fired. At trial, Sanjuan testified that he could not read the application, and his attorney simply asked him to sign the document. The jury disregarded the application when it found that Sanjuan could have returned to his former position. The risk of harm under these facts is self-evident.

### B. Profitability of the Defendant's Misconduct.

At the time plaintiff was discharged, IBP had a bonus program in place which gave supervisors a bonus if they kept workers compensation costs below established levels. One could look at the program as paying management to fire injured employees. At the very least, such a program creates an atmosphere of aggression, harassment, and retaliation. There was evidence presented at the hearing that management harassed and yelled at injured employees. This type of hostile atmosphere would discourage injured workers from seeking medical attention and reporting their injuries. The court does not have before it enough evidence to determine the amount of profit derived from retaliating against injured employees. However, IBP obviously profited from this program, or it would not have put the program in place.

### C. Duration of Misconduct and Attitude and Conduct of Defendant upon Discovery of Misconduct.

There is evidence that IBP has attempted to prevent retaliation. IBP eliminated the bonus program in 1994. IBP also established a procedure to review the decision to terminate injured workers. The decision to terminate an injured employee must now be cleared through the personnel and legal departments. IBP also trains its supervisors to be aware of cumulative trauma injuries and to encourage reporting of such injuries.

As proof that it does not tolerate retaliation, IBP points to its 1999 equal employment opportunity policy statement and anti-harassment policy statements. Both policies endorse affirmative action and forbid discrimination. The policies state, "[employees] will be insured that they will not be retaliated against in any manner for having exercised this right." While the court applauds such efforts, the court also recognizes a distinction between Title VII and workers compensation. The defendant's reference to retaliation is within the context of Title VII disability and general harassment/discrimination. There is no policy at IBP which specifically forbids retaliation against injured employees.

Given IBP's history of policies which encourage retaliation against injured workers, a specific policy is necessary to make it clear that IBP does not tolerate such conduct. This is particularly true when supervisors have not been disciplined for retaliating against an injured worker. No one was disciplined for the decision to fire Sanjuan. Two juries found that IBP

retaliated against Sanjuan, and one jury found that IBP's conduct was serious enough to warrant punitive damages. IBP also did not discipline any supervisors in connection with three other cases in which juries found IBP retaliated against injured workers. *See Ramirez v. IBP, Inc.,* 950 F.Supp. 1074 (D.Kan.1996) (awarding punitive damages); *Rodriguez v. IBP, Inc.,* No. 94–1168–JTM, 1999 WL 1000505 (D.Kan. Oct. 13, 1999); *Ortega v. IBP, Inc.,* 883 F.Supp. 558 (D.Kan.1995). At the punitive damage hearing, several IBP officials testified that they were not aware of any supervisors who were fired due to retaliation against injured workers. IBP could only benefit from policy statements directly addressing retaliation against injured workers.

### D. Financial Condition of Defendant.

IBP is the world's largest producer of beef, pork, and related allied products. The company employees 42,000 people and has forty-five plants in North America and offices worldwide. The company has seen substantial growth in the last five years. In 1998, IBP had annual sales of $12.8 billion and net earnings of $190 million. IBP concedes that it could be accessed the statutory cap of $5 million dollars based on its income. *See* Kan.Stat.Ann. § 60–3702(e).

### E. Total Deterrent Effect.

Litigation itself serves to deter IBP from retaliating against injured workers. *See Ruiz v. Quiktrip Corp.,* 826 F.Supp. 1284, 1286 (D.Kan.1993). There have been a number of lawsuits filed against IBP alleging retaliatory discharge. At least two retaliatory discharge claims have been filed against IBP since Judge Crow's punitive damages award in 1996. *See Ramirez,* 950 F.Supp. at 1080 (awarding $175,000 in punitive damages). The cost of such litigation is substantial. In this case alone, defendant has incurred legal fees in excess of $220,000. Not only is the cost of litigation a deterrent, but so is IBP's need to have a positive image. IBP has a large labor force with high turnover.

If IBP develops a reputation for retaliation, employees and attorneys will be more apt to file lawsuits. The cost of litigation also increases every time a jury awards punitive damages, because courts look at the deterrent effect of past awards.

As discussed above, IBP has taken steps to prevent retaliation. These steps are to be commended. However, there is room for improvement in the area of retaliation against injured workers. The court believes an award of $200,000 is sufficient to restrain defendant from similar conduct and deter others from retaliating against injured workers. After considering all the factors and relevant evidence, the court finds that $200,000 is a reasonable award of punitive damages.

**IT IS THEREFORE ORDERED BY THE COURT** that punitive damages are awarded in the amount of $200,000. The court directs the clerk of the court to enter judgment in favor of the plaintiff in the amount of $99,532.00 in actual damages and $200,000 in punitive damages.